1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2  Including Professional Corporations
   BRIAN M. DAUCHER, Cal. Bar No. 174212
3  BRIAN B. FARRELL, Cal. Bar No. 247878
   650 Town Center Dr., 4th Floor
4  Costa Mesa, CA 92626-1925
   Telephone: 714-513-5100
5  Facsimile: 714-513-5130
   bdaucher@sheppardmullin.com
6  bfarrell@sheppardmullin.com

7

8  Attorneys for Plaintiff,
   Los Angeles Haven Hospice, Inc.
9

10

11                  UNITED STATES DISTRICT COURT

12                 CENTRAL DISTRICT OF CALIFORNIA

13

14                                          CV08-04469 GW (RZx)

15  LOS ANGELES HAVEN HOSPICE,          CASE NO. _____
    INC., a California corporation,
16
                                        **COMPLAINT FOR DECLARATORY,**
17                Plaintiff,            **RESTITUTIONARY, AND INJUNCTIVE**
                                        **RELIEF, AND FOR SUMS DUE UNDER**
18       v.                            **THE MEDICARE ACT**

19  MICHAEL O. LEAVITT, Secretary of
    United States Department of Health and
20  Human Services,

21                Defendant.

22

23

24

25

26

27

28

W02-WEST:3BBF1\400906651.1                                    COMPLAINT

1        Plaintiff Los Angeles Haven Hospice, Inc. brings this action against

2    defendant Michael O. Leavitt under the Medicare Act, 42 U.S.C. § 1395 et seq.  This Court

3    has jurisdiction under 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1331.

4

5    **PARTIES**

6        1.    Plaintiff Los Angeles Haven Hospice, Inc. is a corporation organized

7    and existing under the laws of California, having its principal place of business in this

8    District, at 2895 Temple Avenue, Signal Hill, California, 90755.

9        2.    Defendant Michael O. Leavitt is the Secretary of the United States

10    Department of Health and Human Services.

11

12    **JURISDICTION AND VENUE**

13        3.    This Court has jurisdiction over the subject matter of this action

14    pursuant to 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1331.

15        4.    Venue is proper in this District and before this Court pursuant to 42

16    U.S.C. § 1395oo(f)(1) because this is the judicial district in which Haven Hospice is

17    located.

18

19    **INTRODUCTION**

20        5.    Plaintiff Los Angeles Haven Hospice, Inc. is a Medicare certified

21    hospice provider in Los Angeles.  As a hospice provider, Haven Hospice provides hospice

22    services to eligible Medicare patients in and around the Los Angeles area, namely patients

23    who are terminally ill and who have been certified by physicians to have less than a six

24    month life expectancy

25        6.    The Federal government pays hospice providers like Haven Hospice

26    pursuant to a Medicare program established under Title XVIII of the Social Security Act

27    (the "Medicare Act").  The Department of Health and Human Services ("Medicare")

28

W02-WEST:3BBF1\400906651.1

administers the hospice benefit and reimburses hospice providers on a per diem basis for services to its beneficiaries. However, aggregate annual reimbursements to hospices are subject to an aggregate annual provider cap (the "cap"). Any provider whose revenues from Medicare exceed its aggregate cap are subject to demands for repayment of the difference from Medicare.

7.    On April 2, 2008, Medicare made a demand for repayment to Haven Hospice in the amount of $2,352,499 based upon its calculations of the cap for the fiscal year ended October 31, 2006.

8.    In or around February 2008, Haven Hospice learned that another federal district court had determined that the regulation pursuant to which Medicare performs the cap calculation was invalid. (See Sojourn Care, Inc. dba Sojourn Care of Tulsa v. Michael O. Leavitt, Case No. 07-CV-375-GKF-PJC (N.D.Ok. filed 2007), order granting summary judgment and reporter's transcript re summary judgment hearing attached hereto as Exhibit A.)

9.    On May 14, 2008, Haven Hospice timely filed an appeal of the cap determination with the Provider Reimbursement Review Board, challenging the fiscal year 2006 calculation of its cap, calling out the prior determination of the regulation's invalidity in Sojourn Care, and challenging the validity of the Federal regulation pursuant to which the cap was calculated. With this appeal, because it appeared that the PRRB may have lacked jurisdiction to assess the validity of a regulation, Haven Hospice also sought expedited judicial review.

10.    On June 5, 2008, the PRRB granted Haven Hospice's expedited judicial review request, finding that there are no material facts in dispute, that the amount in controversy exceeds $10,000, and that Haven Hospice's appeal involves principally a legal challenge to the validity of the regulation. When the PRRB makes such a ruling, a Medicare provider has 60 days to file a civil action in Federal District Court. 42 U.S.C. § 1395oo(f)(1).

1          11.    Haven Hospice believes that the Medicare regulation governing

2  calculation of the cap, 42 C.F.R. § 418.309(b), is contrary to the plain language of section

3  1814(i)(2)(C) of the Medicare Act (codified at 42 U.S.C. § 1395f(i)(2)(C)), is arbitrary and

4  capricious, and amounts to unlawful taking of private property for public use without just

5  compensation in violation of the Fifth Amendment of the United States Constitution.

6  Haven Hospice has been severely prejudiced by Medicare's refusal to abide the

7  Congressional mandate regarding the methodology for calculation of the cap, in that cap

8  allowances to which Haven Hospice is entitled under the statute are not allocated

9  proportionally to fiscal years in which Haven Hospice actually rendered the hospice

10  services to its patients, leading to higher cap liability in later years.

11          12.    Accordingly, by this action, Haven Hospice seeks a declaration and

12  order that: (a) Medicare regulation 42 C.F.R. § 418.309(b) is invalid, (b) vacates the

13  regulation and enjoins Medicare from using the regulation to calculate cap liability for

14  Haven Hospice or any other hospice in the future; (c) Medicare's prior calculations of

15  Haven Hospice cap amounts pursuant to 42 C.F.R. § 418.309(b) for fiscal year 2006 is

16  invalid, and (d) Medicare restore to Haven Hospice all sums paid by Haven Hospice

17  pursuant to demands based upon the invalid regulation (with interest) and other further

18  relief as appropriate.

19

20                        **Statutory And Regulatory Background**

21  A.    Hospice Benefit Background

22          13.    The hospice benefit started as an experiment in humane end-of-life

23  care. In 1982, when Congress created the hospice benefit, two caps -- or limits -- were

24  imposed. A lifetime cap limited each beneficiary to a maximum of 210 days of hospice

25  care and a cap on providers limited the amount each hospice could bill Medicare in a

26  single year.

27

28

W02-WEST:3BBF1\400906651.1                    COMPLAINT

14.    Initially, 95 percent of patients choosing hospice care were beneficiaries diagnosed with cancer who had exhausted or grown weary of other treatment options. They stayed in hospice care for only days or weeks and few patients or providers ever exceeded either respective limit. As a result, few if any hospices ever encountered any cap issue.

15.    By the early 1990s hospice was broadly recognized as superior end of life care, and proved highly effective at reducing expensive and often unwanted hospitalizations. At that time, however, 75 percent of Medicare beneficiaries with terminal illnesses -- those not suffering from cancer -- still did not have access to hospice services. Medicare required a physician to certify that a beneficiary had six months or less to live before referring them to hospice care. Many physicians chose not to refer non-cancer patients to hospice because of the uncertainties inherent in life expectancy calculations.

16.    Congress took steps to address this obvious barrier in 1998 with legislation that eliminated the cap on a beneficiary's right to receive hospice care provided that a physician continued to certify that the patient had a life expectancy of six months or less if the disease ran a normal course. Pursuant to these changes, the Medicare Act now provides unlimited hospice coverage for individual Medicare beneficiaries who are certified as terminally ill with a life expectancy of six months or less. Specifically, the Medicare Act now allows hospice care for "two periods of 90 days each and an unlimited number of subsequent periods of 60 days." Section 1812(a)(4) and (d) of the Medicare Act (codified at 42 U.S.C. § 1395d(d)(1)) (emphasis added). The statutory provisions setting the hospice cap were not amended to make them consistent with the statutory expansions in hospice coverage.

17.    Critically, at the same time, Medicare began developing objective standards to define non-cancer patient hospice eligibility so that physicians would have confidence in making terminal diagnoses. These objective standards seek to identify

COMPLAINT

1 | objective characteristics in nine distinct terminal illnesses that suggest an average six
2 | month life expectancy.

3 |         18.     Today, more of America's terminally ill seniors are being given a
4 | hospice choice, and eligible beneficiaries are able to remain enrolled in hospice services
5 | until they pass away.  Non-cancer patients now have better access to care, making up more
6 | than 50 percent of hospice patients.  Nearly half of all Medicare patients who pass on have
7 | received end of life hospice care.

8 |         19.     With these statutory changes, medically eligible beneficiaries are able
9 | to stay longer in hospice care.  As a consequence, average length of stay is rising.  But,
10 | notably, it remains below six months.

11 |         20.     Hospice providers who are providing covered services to eligible
12 | Medicare beneficiaries have begun exceeding the cap at an alarming rate.  In 1997,
13 | virtually no hospice providers exceeded the cap.  In 2004, hospices in 15 states exceeded
14 | the cap.  These providers were asked to repay Medicare an estimated $100 million.  For
15 | fiscal year 2005, it is estimated that hospices in at least 25 states have exceeded the cap
16 | and that those providers have or will be asked to repay approximately $200 million to
17 | Medicare.  For fiscal year 2006, the numbers have again increased.

18 | B.     The Calculation of the Cap

19 |         21.     Since inception, the Medicare Act has provided that total payments to
20 | a hospice provider in any fiscal year may not exceed an aggregate cap, calculated as the
21 | product of the individual cap amount (adjusted annually for inflation) and the "number of
22 | Medicare beneficiaries" in a hospice program in an accounting year.  Section
23 | § 1814(i)(2)(A) of the Medicare Act (codified at 42 U.S.C. § 1395f(i)(2)(A)).  For fiscal
24 | year 2006, the cap amount per beneficiary was $20,585  per beneficiary.  In spite of
25 | statutory expansions of coverage, Congress has yet to change the provider cap in the
26 | statute in any way.

27 |
28 |

COMPLAINT

1           22.    The Medicare Act specifically provides that the number of

2  beneficiaries in an accounting year must be adjusted to reflect the time each such

3  individual was provided hospice care in a previous or subsequent accounting year (42

4  U.S.C. § 1395f(i)(2)(C)):

5          "For the purposes of subparagraph (A), the 'number of Medicare

6          beneficiaries' in a hospice program in an accounting year is equal to the

7          number of individuals who have made an election under subsection (d) of

8          this section with respect to the hospice program and have been provided

9          hospice care by (or under arrangements made by) the hospice program under

10         this part in the accounting year, such number reduced to reflect the

11         proportion of hospice care that each such individual was provided in a

12         previous or subsequent accounting year or under a plan of care established

13         by another hospice program." (Emphasis added.)

14           23.    In 1983, when Medicare issued its proposed regulation to implement

15  the hospice cap, it acknowledged:

16         "The statute specifies that the number of Medicare patients used in the

17         calculation is to be adjusted to reflect the portion of care provided in a

18         previous or subsequent reporting year or in another hospice."

19  48 Fed. Reg. 38,146, 38,158 (Aug. 22, 1983).  Medicare also acknowledged that "The

20  requirements [of the statute] do not allow discretion in the computation method."  Id.

21           24.    However, Medicare nonetheless declined to adopt the specific

22  computation methodology mandated by Congress and instead chose to give providers

23  credit for the cap only in the initial year of service, regardless whether the patient lived

24  into another accounting year:

25         "With respect to the adjustment necessary to account for situations in which a

26         beneficiary's election overlaps two accounting periods, we are proposing to count

27         each beneficiary only in the reporting year in which the preponderance of the

28

W02-WEST:3BBF1\400906651.1

COMPLAINT

1    hospice care would be expected to be furnished rather than attempt to perform a

2    proportional adjustment."

3  (Emphasis added.)  48 Fed. Reg., supra, at 38,158 (Aug. 22, 1983).

4           25.    In so doing, Medicare conceded that it was planning not to implement

5  the plain language of the statute because it would be "difficult":

6    "Although section 1814(i)(2)(C) of the Act specifies that the cap amount is to be

7    adjusted 'to reflect the proportion of the hospice care that each such individual was

8    provided in a previous or subsequent accounting year . . .' such an adjustment would

9    be difficult in that the proportion of the hospice stay occurring in any given year

10    would not be known until the patient dies or exhausted his or her hospice benefits.

11    We believe the proposed alternative of counting the beneficiary in the reporting

12    period where the beneficiary used most of the days of covered hospice care will

13    achieve the intent of the statute without being burdensome."

14  (Emphasis added.)  48 Fed. Reg., supra, at 38,158 (Aug. 22, 1983).

15           26.    Notably, however, when it came to implementing the companion

16  statutory requirement that the cap be apportioned among different hospices if two or more

17  provided services to a specific patient, Medicare required such calculations:

18    "When a beneficiary elects to receive hospice benefits from two different hospices,

19    we are proposing a proportional application of the cap amount."

20                          * * * * * * * * * * * * * * * * * *

21    "We are aware that this type of apportioning of the beneficiary's stay may result in

22    the inclusion of a beneficiary in the calculation of the cap for a reporting period

23    other than the period for which the services were furnished, since it is necessary that

24    the beneficiary die or exhaust his or her benefits before the percentage can be

25    determined.  However, we believe that this proposal is the most equitable means of

26    implementing the statutory directive to adjust the cap amount to reflect the

27

28

1    proportion of care furnished under a plan of care established by another hospice

2    program."

3    (Emphasis added.) 48 Fed. Reg., supra, at 38,158 (Aug. 22, 1983). In short, Medicare

4    demonstrated through its own conduct that apportionment of the cap across years was

5    indeed possible.

6         27.    In December 1983, Medicare issued its final hospice reimbursement

7    regulation, including the provision allocating the hospice cap amount for a beneficiary

8    only in the initial year in which the patient elected hospice care. The regulation provides:

9    "Each hospice's cap amount is calculated by the intermediary by multiplying the

10    adjusted cap amount determined in paragraph (a) of this section by the number of

11    Medicare beneficiaries who elected to receive hospice care from that hospice during

12    the cap period. For purposes of this calculation, the number of Medicare

13    beneficiaries includes –

14        (1)    Those Medicare beneficiaries who have not previously

15    been included in the calculation of any hospice cap and who have filed an election

16    to receive hospice care, in accordance with § 418.24 from the hospice during the

17    period beginning on September 28 (35 days before the beginning of the cap period)

18    and ending on September 27 (35 days before the end of the cap period).

19        (2)    In the case in which a beneficiary has elected to receive

20    care from more than one hospice, each hospice includes in its number of Medicare

21    beneficiaries only that fraction which represent the portion of a patient's total stay in

22    all hospices that was spent in that hospice...."

23    42 C.F.R. § 418.309(b)(1) and (2) (emphasis added).

24         28.    To attempt to ameliorate the negative effects of the departure from the

25    Congressional mandate to allocate the cap across years of care, Medicare shifted the initial

26    reporting year for "first election" of care from the standard Medicare fiscal year

27    (November 1 through October 31) to an earlier time frame (September 28 to following

28

-8-

September 27). Thus, if a patient was admitted September 27, 2005, such patient's cap allocation would be entirely to fiscal year 2005; however, if the same patient was admitted September 28, 2005, such patient's cap allocation would be entirely to fiscal year 2006. Haven Hospice alleges that this shift is insufficient to ameliorate the prejudice to hospice providers by Medicare's failure to allocate cap allowances proportionally to the years in which services are actually rendered.

29.    Medicare's allocation of the cap amount only to the first reporting period in which the beneficiary elects the hospice benefit results in the assignment of the entire cap amount to the first reporting period even if most of the hospice care for that patient is rendered in a subsequent period. Thus, unused cap amounts in one fiscal year are "trapped" in the prior year, regardless of whether the beneficiary continues to receive care in subsequent years. The failure to allocate the cap across years of care results in an understated aggregate hospice cap.

30.    Medicare's failure to follow the Congressional mandate to allocate the cap proportionately across years of care subjects hospice providers to improper repayment demands for services properly rendered. Indeed, the court in Sojourn Care made the following findings about the Medicare regulation governing calculation of the cap (42 C.F.R. § 418.309(b)), before ruling on summary judgment that the regulation was invalid:

> "[W]ith due respect I agree with the plaintiffs here that the regulation as written does not comport or comply with the statute ... I don't believe that the statutory language which requires that the number of Medicare beneficiaries is to be reduced is in any way reflected in an allocation to one of the fiscal years, one or the other, and it's certainly not – it doesn't honor the statutory language that the number must be reduced to reflect the proportion of hospice care that each such individual was provided ... The number of Medicare beneficiaries is simply not reduced under this regulation in any way to reflect the proportion of hospice care that each such

1    individual was provided in a previous or subsequent reporting year ... I simply don't

2    believe that it follows the statutory mandate in the statute."

3    (See Reporter's Transcript, <u>Sojourn Care, Inc. dba Sojourn Care of Tulsa v. Michael O.</u>

4    <u>Leavitt</u>, Case No. 07-CV-375-GKF-PJC (N.D.Ok. filed 2007), pp. 54-55, attached hereto

5    as Exhibit A.)

6

7    **<u>Facts Specific To This Case</u>**

8    31.    Haven Hospice received its license as a hospice provider in Los

9    Angeles, California in June 2003.  Since that time, Haven Hospice has served

10    approximately 1500 patients in the Los Angeles area.

11    32.    In fiscal year 2006 (ended October 31, 2006), Haven Hospice served

12    many patients first admitted in fiscal year 2005.  Medicare paid Haven Hospice for these

13    services as rendered in fiscal year 2006.  However, because of the cap regulation which

14    traps cap room in prior years, Haven Hospice received no cap allocation for these patients

15    in fiscal year 2006.

16    33.    As a result, on April 2, 2008, Medicare sent Haven Hospice demand

17    for repayment of $2,352,499 for exceeding its fiscal year 2006 cap.  If Medicare had

18    followed the Congressional mandate to allocate cap room across years of service, Haven

19    Hospice alleges on information and belief that its cap liability for fiscal year 2006 would

20    have been materially reduced.  As a result, Haven Hospice has suffered material prejudice

21    from Medicare's failure to follow the Congressional mandated allocation of cap allowances

22    across years of service.

23

24    **<u>Assignment Of Errors</u>**

25    34.    Medicare's regulation specifying the calculation of the hospice cap,

26    specifically 42 C.F.R. § 418.309(b)(1), is contrary to the Medicare act (specifically 42

27    U.S.C. § 1395f(i) (2)(C)), is arbitrary and capricious, and amounts to unlawful taking of

28

-10-

1  private property for public use without just compensation in violation of the Fifth

2  Amendment of the United States Constitution.

3

4  **<u>Relief Requested</u>**

5  Haven Hospice respectfully requests the following relief:

6      1.    A declaration that Medicare's regulation regarding the calculation of

7  hospice cap, specifically 42 C.F.R. § 418.309(b)(1), is invalid.

8

9      2.    A declaration that Medicare's prior calculation of Haven Hospice's

10 cap liability for fiscal year 2006 is invalid.

11

12     3.    An order requiring Medicare to return to Haven Hospice, with

13 interest, all monies Haven Hospice has paid towards repayment of the alleged 2006

14 overpayment.

15

16     4.    Pending resolution of this matter, a preliminary injunction enjoining

17 Medicare from continuing to demand repayment by Haven Hospice of the alleged 2006

18 overpayment and from calculating subsequent fiscal year alleged overpayments relating to

19 Haven Hospice pursuant to the current version of 42 C.F.R. § 418.309(b)(1).

20

21     5.    Following resolution of this matter, an order vacating the regulation as

22 to Haven Hospice and nationwide, and an injunction against Medicare's further use of the

23 invalid regulation as to any hospice, including Haven Hospice.

24

25     6.    An order requiring defendant to pay legal fees and costs of suit

26 incurred by plaintiff.

27

28

W02-WEST:3BBF1\400906651.1

1    7.  Such other and further relief as the Court may consider appropriate.

2

3 Dated: July 8, 2008

4

5        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        By

6

7            BRIAN M. DAUCHER
            BRIAN B. FARRELL

8

9        Attorneys for Plaintiff, Los Angeles Haven
            Hospice, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:3BBF1\400906651.1                    COMPLAINT

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SOJOURN CARE, INC., d/b/a SOJOURN CARE OF TULSA, a Delaware Corporation, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 07-CV-375-GKF-PJC |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of United States Department of Health and Human Services, | ) ) | |
| | ) | |
| Defendant. | ) | |

### ORDER

For the reasons set forth on the record of this date, plaintiff's Motion for Summary Judgment

[Docket No. 11] is granted, and defendant's Motion for Summary Judgment [Docket No. 19] is

denied.


IT IS SO ORDERED this 13th day of February 2007.




Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

   SOJOURN CARE, INC., d/b/a          )
4   SOJOURN CARE OF TULSA, a          )
   Delaware Corporation,          )
5                                 )
          Plaintiff,          )
6                                 )
   V.          )   No. 07-CV-375-GKF-PJC
7                                 )
   MICHAEL O. LEAVITT, Secretary  )
8   of United States Department     )
   of Health and Human Services,  )
9                                 )
         Defendant.          )
10

11          REPORTER'S TRANSCRIPT OF PROCEEDINGS

12             HAD ON FEBRUARY 13, 2008

13                  MOTION HEARING

14

15  BEFORE THE HONORABLE GREGORY K. FRIZZELL, Judge

16

17  APPEARANCES:

18  For the Plaintiff:    Ms. Linda Gale Scoggins
                   Scoggins & Cross PLLC
19                 204 North Robinson, Suite 3100
                   Oklahoma City, Oklahoma 73102
20
                   Mr. Brian M. Daucher
21                 Shepphard Mullin Richter & Hampton LLP
                   650 Town Center Drive, 4th Floor
22                 Costa Mesa, California 92626

23  For the Defendant:    Mr. Daniel E. Bensing
                   U.S. Department of Justice, Civil Division
24                 Special Programs Branch
                   Post Office Box 883
25                 Washington, DC 20044

2

<u>PROCEEDINGS</u>

February 13, 2008

1      THE COURT:  Be seated please.

2      THE CLERK:  We're here in the matter Sojourn Care,

3 Inc. vs. Michael Leavitt, case number 07-CV-375-GKF.  Will the

4 parties please enter their appearance.

5      MS. SCOGGINS:  Linda Scoggins and Brian Daucher for

6 the plaintiff.

7      THE COURT:  And last name, I'm sorry.

8      MS. SCOGGINS:  Brian Daucher.  We had just filed an

9 application for admission pro hac vice.

10      THE COURT:  Which we granted this morning.

11      MS. SCOGGINS:  Okay.

12      THE COURT:  D-O-W-S-H-I-R-E?

13      MS. SCOGGINS:  D-A-U-C-H-E-R.

14      THE COURT:  D-A-U-C-H-E-R?

15      MS. SCOGGINS:  Yes.

16      THE COURT:  All right.

17      MR. BENSING:  Daniel Bensing with the Civil Division

18 of the Justice Department on behalf of the defendant.  Ms.

19 Cathy McClanahan is with me as well, but she's not counsel.

20      THE COURT:  Welcome all.  I apologize for being late.

21 Today is Rotary and they had the meeting in a different

22 location with a parking garage that took a long time to

23 discharge cars, so we ran over here as quickly as we could, and

3

1   I apologize.

2        I'm particularly interested in -- and you-all have not

3   ever appeared before me, I enjoy oral argument and it is not

4   infrequent to change my mind going into one of these matters --

5   but I'm particularly interested in standing, in injury in fact,

6   particularly because I see, you know, the 2.1 whatever, million

7   payment that had to be paid over a five-year period and now

8   we're looking at another one, and I'm really wrestling with

9   standing.  So just to alert you, you need to address that.  But

10  lawyers changed my mind at oral argument yesterday, so it's not

11  impossible.  This is defendant's motion for summary, unless

12  you-all think that I ought to address one of the other motions

13  first.  It would seem to me the motions summary ought to be

14  addressed first addressed, but perhaps you have agreed

15  otherwise.

16        MS. SCOGGINS:  Well actually, Your Honor, I believe we

17  filed the motion for summary judgment first, the plaintiffs

18  did.

19        THE COURT:  All right.

20        MR. BENSING:  And we cross moved, and so in any order

21  that the Court wants.

22        THE COURT:  All right, very well.  But you-all agree

23  that the motions for summary ought to be addressed first, I

24  guess that was --

25        MS. SCOGGINS:  Yes, absolutely.

```
 1            MR. BENSING:  Yes.

 2            THE COURT:  Ms. Scoggins.

 3            MS. SCOGGINS:  Thank you, Your Honor.  And you're

 4    correct, I have not appeared before you before and so please do

 5    not hesitate to interrupt me, stop me and tell me I'm going the

 6    wrong direction if you see fit.  I have prepared and provided

 7    to counsel for the government sort of an outline of the summary

 8    judgment hearing today from Sojourn Care's perspective.  And

 9    just starting out with basically an understanding of what the

10    hospice benefit is.  That being the end of life palliative care

11    for terminally ill Medicare beneficiaries.  And for your

12    information Sojourn Care was established and started providing

13    care in Tulsa in about the middle of 2002.  And for fiscal

14    years 2003 and 2004 they did not even meet the cap and so the

15    cap was not an issue at that point as they were just getting

16    started and treating Medicare beneficiaries.  As you probably

17    know, the eligibility hinges on life expectancy of six months

18    or less determined by a physician, however, it can be extended.

19    And they do not punish patients for the good fortune of living

20    longer than expected and in fact when the cap or when the

21    hospice benefit was first enacted in 1983 there was a 210 day

22    limit on providing services and now it's unlimited and the

23    hospice provider is reimbursed on a per diem basis.

24            THE COURT:  Now it's unlimited in terms of time but

25    limited in terms of the money payable.
```

5

1        MS. SCOGGINS:  That's correct.  That's correct.

2        THE COURT:  So as a practical matter to make this work

3   from your point of view, I take it you have to take some sort

4   of steps if you are capped, and I'm told that your cap is

5   19,000 and some dollars; is that correct?

6        MS. SCOGGINS:  I believe for the years at issue

7   here --

8        THE COURT:  19,778 is what they told me.

9        MS. SCOGGINS:  Either that or 18,600.  It's every year

10  they adjust it somewhat.  So 19,700 is a good ballpark.  I

11  think maybe in 2007 and 8 it goes to a little over 20,000

12  but...

13       THE COURT:  All right.  But for the applicable period

14  here 19,778, is that the 2005 figure?

15       MS. SCOGGINS:  Do you know?  Okay.  That is the 2005

16  figure.

17       THE COURT:  I understand part of the problem here is

18  that your average stay is, I don't think it's critical at this

19  juncture exactly what it was, but your average stay in 2005 was

20  131 days.  Using simple division it talks -- that results in a

21  per diem of $150.98.

22       MS. SCOGGINS:  But you're not paid that, yeah.

23       THE COURT:  I understand.

24       MS. SCOGGINS:  Uh-huh.

25       THE COURT:  I understand.  You are paid up to the cap

1    of 19,778.  We tried to put a pencil to it in chambers relative

2    to what you received in Medicare for the 2005 fiscal year and

3    forgive us if this is wrong, but it came out to about 23,663.

4    The point being -- we can quibble about the dollars -- but the

5    point being that you exceeded the cap here by some $4,000 per

6    person.

7            MS. SCOGGINS:  A total of -- well, yes, if you look at

8    it that way.  I mean because --

9            THE COURT:  Well, but you have to look at it that way;

10   correct?

11           MS. SCOGGINS:  Well, ex --

12           THE COURT:  I mean, in terms of dollars and cents

13   because you as a matter of federal law as established by

14   Congress.

15           MS. SCOGGINS:  Uh-huh.

16           THE COURT:  You can't get more than the cap.

17           MS. SCOGGINS:  Absolutely.  Absolutely.

18           THE COURT:  So you have to look at it to a certain

19   extent that way, unless you want to lose money every year;

20   right?

21           MS. SCOGGINS:  Yeah, but the per diem, they don't

22   start with the cap and if you keep them less than so many

23   days --

24           THE COURT:  I understand.

25           MS. SCOGGINS:  -- determine how to pay you.  So....

```
 1                THE COURT:  I'm sorry.

 2                MS. SCOGGINS:  Yeah, I mean you're paid based on

 3     certain increments like for in-home care, hospital care based

 4     on what -- and 97 percent of it, as you might guess, would be

 5     in-home care for hospice.

 6                THE COURT:  Up to the cap.

 7                MS. SCOGGINS:  Up to the cap.

 8                THE COURT:  All right.  But I mean there goes the

 9     problem.  I mean if your average cost is 24 grand in 2005,

10     that's not the exact figure, but you've got a problem just as a

11     business matter as opposed to a federal law matter, which plays

12     into my issue of standing.

13                MS. SCOGGINS:  Well and --

14                THE COURT:  Injury in fact.  I mean, how is the

15     resolution of this legal issue going to pull you out of the

16     fire?

17                MS. SCOGGINS:  Well, we don't think that that is the

18     basis for all of our injury and we don't believe, and I have

19     cases that I've cited, we don't believe that it has to be the

20     bases of your -- it has to totally redress you.  We believe

21     that it caused some of the injury but not all of it.  And we do

22     not dispute that it did not cause all of it.  But we believe

23     that if they interpreted, if the regulation did not conflict

24     with the statute, that the amount that we would have to repay

25     would be less.  In addition, you know, the amount like in 2003
```

```
1   and 2004, when you don't hit the cap, of course, that amount
2   does not carry forward but some of those patients carry forward
3   and yet you're not paid for those patients even though they
4   fell in -- because they fell in other years.  Even though you
5   are providing care for them they are not considered in the
6   year.
7              THE COURT:  Well, but you have been allowed the cap
8   for the previous year; correct?
9              MS. SCOGGINS:  Yes, that's correct.
10             THE COURT:  So as a practical matter the Secretary has
11  said or at least the Secretary's predecessor, it's been quite a
12  long time, that over time things balance out.  Explain to me
13  how, if we're exceeding the cap every year, the resolution of
14  this matter is going to solve your problem?
15             MS. SCOGGINS:  We believe, Your Honor, that it will
16  solve part of the problem.  I mean, my client believes --
17             THE COURT:  Okay.  Explain to me how it would solve
18  part of the problems.
19             MS. SCOGGINS:  Well, all right, if you would -- we
20  have some examples that I put in your materials.  And by the
21  way, Sojourn Care's average length of stay, 130 days, they
22  provide care for more than just cancer patients.  When this all
23  started in 1983 it was basically just geared for cancer
24  patients and there was a much shorter average length of stay.
25  And in the late 1990s that was expanded to include a number of
```

9

1    different end-of-life illnesses and as a result ever since then

2    the average length of stay has been going up considerably.  And

3    Sojourn Care provides care not just to cancer patients.  And a

4    lot of like hospital-based hospices and all, that's their

5    primary client base, patient base.  So that's one of the

6    reasons, and this has happened across the country, and

7    especially I believe 16 states across the sun belt especially

8    has, you know, their average length of stay has gone up

9    consistently because of these illnesses.

10            THE COURT:  Yes, I saw Arkansas, Oklahoma, like you

11    say some of the southern/sun belt states.

12            MS. SCOGGINS:  Maybe it's because we get a lot of

13    sunshine.  We live longer.  But if you will look on, I believe

14    it's on page 15 of the handout, also we can go to it on the

15    PowerPoint but it's in hardcopy.  Is that page 15?

16            MR. DAUCHER:  The first example.

17            MS. SCOGGINS:  Yeah, the first example.

18            THE COURT:  But surely you are seeking administrative

19    redress in terms of these lengthening stays.  Surely that would

20    be an available way of solving this problem; correct?

21            MS. SCOGGINS:  Yeah, but that is not a situation where

22    a regulation has been promulgated that conflicts with and

23    contradicts, you know.

24            THE COURT:  I understand it's a separate issue, sure.

25            MS. SCOGGINS:  Yeah, yes.

1    THE COURT:  All right.  Well, I will then limit my

2    focus to that which is on my plate today.

3    MS. SCOGGINS:  All right, Your Honor.  I think it's

4    page 15 of -- is that right, does it say example calculations

5    there?

6    THE COURT:  Yes.

7    MS. SCOGGINS:  Okay.  And the previous page 14 gives

8    you the assumptions.  And of course, we had to take something

9    simple in terms of numbers and said a hospice with no patients

10   admits 100 patients on September 27, which is the day,

11   September 28 is the day that the agency, that Medicare has

12   arbitrarily set in their regulation as the date where if you

13   are admitted prior to September 28 you're considered a patient

14   in that particular fiscal year, if you are admitted on

15   September 28 you are considered a patient for the subsequent

16   fiscal year.  So anyway, we said let's assume that that occurs

17   and every patient admitted lives exactly a hundred -- lives,

18   you know, because we are looking at what Sojourn Care, their

19   average length of stay is, 130 days, and they die on February

20   3.  And the hospices' average reimbursement is $125 per patient

21   day which is that weighted average of routine home care,

22   general in-patient care, continuous care, and respite care.

23   And then if you look at that calculation you show in the right

24   hand column is how it would be calculated now under the

25   regulation.  In the left-hand column is the statutory

```
1    calculation.  So what happens with these patients, they spent
2    35 days in fiscal year 2004 and 95 of those days in fiscal year
3    2005.  As the services were provided Sojourn Care or the
4    hospice receives Medicare revenues, and again at about $125
5    dollars a day, and they come in, you know, in relation to when
6    the services are provided.  So they come in in 2004 and 2005.
7    Now here is where you get to the statutory cap allowance.  That
8    cap allowance, and you will notice that I used the $18,963
9    figure because I believed that that's what it was in fiscal
10   year 2004, but it could be 19,777, it wouldn't make much
11   difference.  But the cap allowance per patient would be, if you
12   use the statutory language as a guideline, and that is to apply
13   in the year in which they are patients, that would be for
14   fiscal year 2004, $510,000.  For physical 2005, 1,385,000.
15   However -- now that's the statute, that's Congress' mandate.
16   Now the regulation, however, would give you, would put all the
17   cap in 2004 and zero cap in 2005 and the result would be that
18   in 2004 you would have provided and received revenues of
19   $437,500 and that would be it, that would be what you would
20   get.  Obviously you do not get paid for any gap in the cap
21   allocation.  But the following year, because they put the
22   entire cap, because they haven't applied the cap exactly how
23   the patient is treated and when the patient is treated, in 2005
24   you've provided the vast majority of the treatment for the
25   patient but as you can see you have to pay back $1,187,500 for
```

1    those patients.

2          So in other words, you stayed under the cap -- all

3    months that you had this particular patient for the 130 days

4    you always, you know 2004 you provided 437,500.  And tracking,

5    you know, tracking under the cap allowance of half a million

6    dollars in fiscal year 2005 you provided over a million dollars

7    in services but staying under what's allowed by the cap.  So

8    you've never paid the total cap but at least -- And you know,

9    one of the things that the statutory calculation shows is

10   exactly the intent that Congress had in -- Congress wanted to

11   ensure that payments for hospice care would not exceed regular

12   Medicare payments in a conventional setting.  And a

13   conventional setting, and that, even the quote is in, I think,

14   the government's brief on page 5 of their opposition brief.

15   And as you could see if you follow the statutory calculation,

16   what's instructed in the statute it literally follows right

17   along with the cap.  It's under the cap but it follows along.

18   However, in the second scenario you have been paid $437,000 in

19   year one and you're paid 1,187,000 in year two but you have to

20   pay back that entire year two where you provided 95 out of the

21   130 day services.

22          THE COURT:  So mainly you get hurt on the front end.

23          MS. SCOGGINS:  Or -- well, I consider that the back

24   end because it's in the second year that the last 95 days of

25   services you provide you basically have to pay back everything.

1          THE COURT:  Yeah, I understand that.  But I guess I

2    was focusing on you're not able to allocate to that first year

3    when you still had cap available.

4          MS. SCOGGINS:  That's correct.

5          THE COURT:  Yes.

6          MS. SCOGGINS:  That's correct.  It's kind of forever

7    trapped there, no carry forward whatsoever.

8          And there's another example that follows that that I

9    actually use the example that the government had used in their

10   brief, but put in Sojourn Care's average length of stay of 130

11   days.  And again it shows, even if you were looking at two

12   patients you would still have to pay back about 10 percent of

13   what you're paid for the services provided in that second year.

14         The procedural history that got us here, as you know,

15   is that we -- in December of 2006, HHS demanded that Sojourn

16   Care repay the $2.1 million.  That was in 2006 and it was for

17   the year ending October 2005.  And in March of '07 Sojourn Care

18   filed their timely appeal with the PRRB of the cap

19   determination and then the next month Sojourn Care sought

20   permission from the PRRB for an expedited judicial review.  And

21   in May PRRB grants the request for the expedited judicial

22   review holding that it is -- that it, the PRRB, is without

23   authority to decide the legal question of whether the

24   regulation is valid.

25         So with regard to standing it's sort of like the PRRB

```
1    can't decide and sends you to court and that is where you
2    supposedly have your remedy.  But I'll get to --
3              THE COURT:  Well, but it's not where you have the
4    remedy, it's where the --
5              MS. SCOGGINS:  It can be heard.
6              THE COURT:  -- the legal question of validity of the
7    regulation can be heard.
8              MS. SCOGGINS:  That's right.
9              THE COURT:  PRRB obviously doesn't have jurisdiction
10   over that.
11             MS. SCOGGINS:  That's correct, Your Honor, absolutely.
12   The cap statute which is set out on page 5 of our motion for
13   summary judgment says that basically that payments made to a
14   hospice provider in an accounting year, which is November 1 of
15   one year to October 31 of the following year, may not exceed
16   the product of the cap amount per beneficiary multiplied by the
17   number of Medicare beneficiaries.  And again that's where this
18   intent and why they have a cap.  Now (2)(C) right under there
19   defines the quote, "number of Medicare beneficiaries" which is
20   the key because you are saying the number of Medicare
21   beneficiaries times the cap amount.  And the definition is in
22   (2)(C).  It's the individuals who have made a hospice, have
23   elected hospice and approved, of course, by the doctor's
24   findings and have been provided hospice care in the accounting
25   year.  But then it goes on and says "such number should be
```

1    reduced to reflect the proportion of hospice care that each

2    such individual was provided in a previous or subsequent

3    accounting year."

4            THE COURT:  Now, I understand that, but I also

5    understand from an administrative point of view having been in

6    a state agency as general counsel before.  I mean one looks at

7    ways to simplify.  I mean government doesn't do these sorts of

8    things very well, it just doesn't.  And so in order to simplify

9    they are saying instead of waiting until the very end and

10   calculate for each individual the proportion of hospice care

11   that was provided in the 2004 fiscal year versus the 2005

12   fiscal year, we'll just allocate it to one or the other.

13           MS. SCOGGINS:  That's correct, that's what they have

14   done.

15           THE COURT:  Right.  And I understand they have to do

16   that with respect to individuals who jump to another hospice.

17           MS. SCOGGINS:  You mean have to do what, looked at

18   each individual according to the statute if they change

19   hospices?

20           THE COURT:  I mean I don't know administratively any

21   other way you could do it.  I mean putting aside statutory

22   construction for a moment, which I can only do for a moment,

23   but I don't know any other way you could do it because you have

24   two different facilities and you have to apportion, right, you

25   have to go through that accounting problem that I just

1    mentioned.

2          MS. SCOGGINS:  That's correct.  And I would not be

3    surprised, having practiced law as many years as I have, if we

4    didn't have hospices, you know, owned by the same underlying

5    entities and transferring to get that type of calculation.

6          THE COURT:  What's the total impact to you?

7          MS. SCOGGINS:  All right, we don't --

8          THE COURT:  I mean historically, what is the impact,

9    seeing that you have now sought injunctive relief?  I mean, you

10   title it a motion to stay but really it's a Rule 65 motion for

11   injunction, that's what it is.  You attempted to soften it and

12   I understand as an advocate that's a wise thing to do, but

13   you're anticipating another demand to repay the American

14   taxpayers.  What's the historical -- I mean surely you've had

15   accountants look at this -- what's the effect on you?

16         MS. SCOGGINS:  Well, one effect that we know is --

17         THE COURT:  No I mean in terms of dollars and cents.

18         MS. SCOGGINS:  Dollars, okay.

19         THE COURT:  What does it cost you?

20         MS. SCOGGINS:  Well, we believe that that $2.1 million

21   that was kept out in 2003 that we didn't meet the cap in 2003

22   and 2004, we believe that that is the amount that had we been

23   able to calculate and, you know, put those patients in the

24   years in which they actually received service that we would

25   have captured most of that $2.1 million.

1          THE COURT:  Seriously?

2          MS. SCOGGINS:  Yes.

3          THE COURT:  Okay.  But that's at this point that's no

4    more than lawyer talk, I don't have anything evidentiary before

5    me?

6          MS. SCOGGINS:  All we have evidentiary is I think we

7    provided in our attachments to our brief the complete recap of

8    the patients and an affidavit from the owner of Sojourn Care

9    but we did not come up with a hard number.  Our position is

10   that it is up to the government to calculate that amount in

11   accordance with the statute.  And we're not arguing about the

12   cap, again, as I think you totally recognize.  We're arguing

13   about -- you know, we have patients sometimes in three years

14   and we're arguing about how the cap is allocated.

15         THE COURT:  That's fairly rare though; right?

16         MS. SCOGGINS:  It is.  It is.  Most of them has

17   totally ended by, you know, within -- well definitely we have

18   that average length of stay of 130 days, but most of them,

19   yeah, six months is the max.

20         THE COURT:  All right, now on an accounting basis if

21   you do have that rare individual who straddles three accounting

22   years, and let's take someone who transfers from one facility

23   to another, do you first allocate the days and then apply the

24   percentage, the applicable proportion of the total stay to

25   which rate, because you've got three rates presumably --

1          MS. SCOGGINS:  It will be different rates.

2          THE COURT:  -- in an inflationary environment.  I mean

3    we haven't experienced a deflationary environment although some

4    economists say we're about to get there.  Which of those three

5    rates do you apply?

6          MS. SCOGGINS:  They use the rate that is applicable

7    for each year.  And you can actually look in one of our

8    exhibits is the letter concerning this $2.1 million demand for

9    repayment, has attached to it each and every patient where that

10   applied, where the patient changed hospices, came to our

11   hospice from some other hospice.  And I mean they already --

12   there's a printout that shows exactly what the amount will be

13   and it, I'm sure, and I certainly don't know software, but I'm

14   sure that it has the numbers, it would not overpay, it would

15   not insert the rate for the year 2006 into --

16         THE COURT:  You have that kind of confidence in

17   government?

18         MS. SCOGGINS:  Yes.  Yes, I do, Your Honor.  And you

19   know we have pointed out talking about the difficulty -- and

20   you know, it's our position that under Chevron that you don't

21   even get to that if the regulation is not consistent with the

22   statute, which these examples show that the calculation is not

23   the same if the regulation is not consistent the analysis stops

24   there.  However we have addressed all those other side issues

25   that the government raised in its brief in opposition.  And you

1    know, it's our position that the plain language makes it

2    different but it's not only the plain language.  The comments

3    by Medicare and by Health and Human Services in the Federal

4    Register as pointed out in the bottom of page 5 of our brief

5    and the top of page 6.  I mean they said, the statute specifies

6    that the number of Medicare patients used in the calculation is

7    to be adjusted to reflect the portion of care provided in a

8    previous or subsequent reporting year or in another hospice.  I

9    mean they acknowledge that, it's acknowledged and admitted in

10   the Federal Register.  And then they say, however, we are

11   proposing to count each beneficiary only in the reporting year

12   in which the preponderance of care would be expected to be

13   furnished rather than attempting to perform a proportional

14   adjustment.  They say such an adjustment would be difficult.

15        Well, it's our position, Your Honor -- and then in the

16   government's brief in this case they say rather than making a

17   proportional adjustment on a patient-by-patient basis they

18   decided to do this, set an arbitrary date on which if people

19   elect for the hospice before that date they are put in a

20   previous or in that fiscal year and if it's after that date

21   they are put in the subsequent.  So they admit not only does

22   the plain language show that they are not consistent, and

23   applying them shows that they are not consistent, but then they

24   admit that they are not consistent.  And you know, there are

25   cases that we've cited, Supreme Court cases in addition to

```
 1   Chevron, also Brown v. Gardner invalidating a VA regulation as

 2   inconsistent with the statute.  And by the way in that case is

 3   the one where evidently it was the first one -- the first time

 4   it had been challenged in 60 years.

 5              THE COURT:  That doesn't bother me.

 6              MS. SCOGGINS:  Okay.

 7              THE COURT:  Now, help me out with some of the

 8   technical aspects here.  Surely, although you began, as I

 9   understand it, on August 27th of 2002, did they treat that

10   partial year, fiscal year from 8/27/02 to 10/31/02 separately

11   or did they put it in with the next fiscal year?

12              MS. SCOGGINS:  I believe and I'll ask -- the clients

13   are here, I will ask them to correct me if I'm wrong -- I

14   believe they included that in the next fiscal year.

15              THE COURT:  Well, that's how we read it.  And correct

16   me if I'm wrong, but we saw these materials as indicating a

17   trapped amount of 1 point -- at least from your perspective

18   $1.9 million.

19              MS. SCOGGINS:  Yes.

20              THE COURT:  In other words you're saying we can't go

21   back now and take advantage of that to offset.

22              MS. SCOGGINS:  Well, that's true.  And I see it as you

23   can't, like you said awhile ago, you can't move that forward

24   when you keep them 95 days or days in the following fiscal year

25   you can't take advantage of that difference and apply it
```

1  forward.  You know it's just lost and that's what I mean by

2  trapped, it's gone, that surplus is gone.  And if you have

3  provided the patient 35 days in one fiscal year and 95 days in

4  the next fiscal year, you're just out of luck because the

5  surplus is gone.  And that is what we believe that arbitrary

6  date does.  And you know, there are only so -- you know, if 70

7  obviously is the average and you have this number of days, you

8  have this bell curve, and there are going to be a lot of

9  hospices and this increase -- now, you have to understand this

10  increase in the length of stay has really started about 2000.

11  It was kind of, I think it was the late '90s when they expanded

12  it beyond cancer care.  And so it's really, you know, the

13  fiscal year 2005 is probably a good measure in going forward of

14  the impact of this inaccurate calculation method.

15         THE COURT:  As a practical matter what do you think

16  that's attributable to?  You say to other conditions other than

17  cancer, specifically what are we talking about that has

18  increased the stay?

19         MS. SCOGGINS:  Well, other conditions that -- I think

20  cancer, when it was only cancer, I think that the average

21  length of stay, just if you look at the averages --

22         THE COURT:  Right.

23         MS. SCOGGINS:  Was much shorter --

24         THE COURT:  Sure.

25         MS. SCOGGINS:  -- than it is now.

1          THE COURT:  And what are the conditions?

2          MS. SCOGGINS:  And You know, you have COPD, dementia,

3     you know all sorts of --

4          THE COURT:  COPD can linger a long, long time.

5          MS. SCOGGINS:  Yeah.

6          THE COURT:  And dementia as well.

7          MS. SCOGGINS:  Yeah, I agree.

8          THE COURT:  And dementia is included.

9          MS. SCOGGINS:  It is.  It is.  And you know, and the

10    last thing -- I mean I take a lot of pride in representing this

11    client and I can tell you that the last thing that they would

12    ever, ever do is try to get rid of a beneficiary or something

13    because they're there.

14         THE COURT:  I understand, but -- now this is kind of

15    beyond us, but I'm sure members of the industry lobbied

16    Congress or HHS to include those individuals other than cancer

17    patients; right?

18         MS. SCOGGINS:  They may have, I'm sure they did, and

19    we provide care for a lot of those patients.  And you know, I

20    believe you're right, that these issues are some issues not

21    addressed in this lawsuit at all but are being addressed in the

22    legislature right now.

23         THE COURT:  Well, I mean as always it -- I say as

24    always, as often proves the case it's really a question of

25    money.

1          MS. SCOGGINS:  Uh-huh.  Well and, you know, as I

2    showed you in that calculation the intent is try to kind of go

3    along with a Medicare type conventional environment.  And

4    obviously if you are on Medicare at that time in your life they

5    don't say well, if you last 130 days we're only going to pay

6    for it or apply this cap in the first 35 days.  This is the cap

7    for how much Medicare you're going to get.  I mean, it's spread

8    out over the 130 days.  And if you look at our examples when it

9    is spread out and proportioned along the length you will see

10   that it falls closely, you know, if you proportion the cap what

11   they pay with, you know, the intent being it being comparable

12   to Medicare or less than Medicare.  I mean, you will see that

13   that intent is exactly followed.

14          Now about the proportional allocation being unworkable

15   or too burdensome --

16          THE COURT:  Back up just a second.

17          MS. SCOGGINS:  Okay.

18          THE COURT:  One thing I don't understand.  Let's take

19   your example of somebody who spends 35 days at the end of a

20   fiscal year and then spends much longer in the next fiscal

21   year.  And the cap is applied to that first fiscal year; right?

22          MS. SCOGGINS:  That's correct.

23          THE COURT:  Does your client get the benefit, because

24   I understood they did, and if they don't let me know.  Do they

25   get the benefit of the entire $6500 or only that -- as I

1    understand it, they get that individual included as a

2    participant or whatever the term is and then that's multiplied

3    times the cap; correct?

4          MS. SCOGGINS:  It is an aggregate figure.  It is an

5    aggregate figure, yes.

6          THE COURT:  All right.  So it's not just -- just

7    because that person spent 35 days doesn't mean the costs are

8    apportioned only for that --

9          MS. SCOGGINS:  Not only if you had one person to look

10   at; that's correct, Your Honor.

11         THE COURT:  All right.  So you get the advantage of

12   the full 6500, you're just not able to go back and recoup the

13   trapped amounts that occurred in your case back in fiscal year

14   '03.

15         MS. SCOGGINS:  And '04.

16         THE COURT:  And '04, that's right, but '04 was quite a

17   bit less; correct?

18         MS. SCOGGINS:  I believe so.

19         THE COURT:  It's about a quarter of million dollars.

20   Okay.  Go ahead.

21         MS. SCOGGINS:  Okay.  Anyway the arguments by the

22   government about the proportional allocation or applying what

23   the statute says to do being unworkable or too burdensome is

24   really without evidentiary support, because you know and they

25   say that when a patient changes hospice is rare, and there's no

1    evidentiary support for that.  However, even by their own, you
2    know, there will be page after page of hospice patients shown
3    on the reports that they gave to us where patients changed
4    hospices.  It's not that rare.  And obviously they have some
5    kind of a program that can calculate how to apply the cap in
6    that situation.  Now in addition to them not really supplying
7    evidence just saying it's more difficult, it's burdensome --
8    and again, it's our argument and we believe that we're
9    supported by case law that says you don't even get there
10   because the regulation does not do what the statute tells you
11   to do.  But even if you got there, the case of Ragsdale vs.
12   Wolverine World Wide, a Supreme Court case, says ease of
13   administration is legally irrelevant.  In that case it was a
14   family medical leave act case and the Court said by its nature
15   the remedy created by Congress requires the retrospective
16   case-by-case examination the Secretary now sought to eliminate
17   in their regulation.  And so we believe that the burden is
18   really irrelevant in the first place because you don't get to
19   that step, and in the second place because of case law is
20   irrelevant.
21            THE COURT:  Let me ask here in terms of the
22   practicalities of the facts here.  Your allegedly trapped
23   amount of $1.9 million in the fiscal year 02/03, that fiscal
24   year 03, you're not going to be able to take the $2 million in
25   overpayments from 05 and ratchet back that far; right?  You can

1   only -- even if this Court were to award the benefits or to

2   adopt the position that you are asking for you would only be

3   able to apply the 2.1 million that you have agreed to pay back

4   over a five year period to the trapped amount of about a

5   quarter of million dollars from fiscal year '04; right?

6           MS. SCOGGINS:  Well, it would really it depend -- it

7   may also, some of it may also go forward, it would just depend

8   on the actual calculation done and when the patients were

9   there.

10          THE COURT:  But you are the one who is telling me that

11  forward it's just more of the same.

12          MS. SCOGGINS:  Well, it is, part of it is more the

13  same.  It's never -- you can't say for sure until you do the

14  calculation according to the statute based -- and you know, the

15  statute says for each person covered.

16          THE COURT:  But you're the one who is asking me to

17  enjoin the federal government from the anticipated demand upon

18  you.

19          MS. SCOGGINS:  Well, until they -- until they

20  promulgate a regulation that follows the statutory mandate and

21  when the regulation follows the statute mandate and is

22  calculated then that money has to -- if they come up with what

23  we owe under the proper calculation under a valid rule, then we

24  have to pay it.

25          THE COURT:  All right, I'm allowing you to pull me

1    away from that which I'm really interested in.  You're only

2    going to be able, as a practical matter to take advantage, even

3    if you prevail legally, on the trapped amount in fiscal year

4    '04; correct?

5         MS. SCOGGINS:  Yes.  May -- can you address that?  Is

6    that all right if Mr. Daucher addresses that?

7         THE COURT:  Yes.  I'm trying to get to the truth here.

8         MR. DAUCHER:  I appreciate that, Your Honor.

9         THE COURT:  Yes, sir.

10        MR. DAUCHER:  The fact is the technical aspects of

11   this has been swinging around in my head probably more than Ms.

12   Scoggins, and God bless her for that but --

13        THE COURT:  Are you CPA as well as a lawyer?

14        MR. DAUCHER:  No but I have an economics degree which

15   means that any numbers case that finds its way around our

16   office ends up in my office.

17        THE COURT:  Yes, sir.

18        MR. DAUCHER:  So.... But I do believe that the 1.9

19   million that you're thinking about in '03 would get pushed to

20   '04, but what you're not considering in my view is that some of

21   the allocation that is currently found in '04 would then get

22   pushed to '05.  Because it's not just the amount in the surplus

23   in the initial year but it's the fact that in each year dollars

24   are trapped earlier than they ought to be.  They don't -- what

25   you have to have to have a fair system here is to make sure

1    that the cap allocations match to the revenues.  That's exactly

2    what Congress understood.  And what we're suggesting is that

3    when you push 1.9 million from '03 into '04, you're going to

4    push some different cap room but same number of dollars ahead.

5            THE COURT:  But you're not going to have that -- are

6    you going to have that full amount pushed to '04.

7            MR. DAUCHER:  The full 1.9 million?

8            THE COURT:  Yes, sir.

9            MR. DAUCHER:  I believe there probably will be some

10   room trapped there.  There is not in the regulation in the law

11   a full carryforward, so it's possible there will be some room

12   trapped.  But I don't believe it will be anything like the 1.9

13   million or the 2.15 total trapped that we now see as a result

14   of a regulation where the government, when it promulgated,

15   assumed incorrectly that every hospice in this land would have

16   an average length of stay of 70 days.  Any hospice in this

17   country that has a length of stay that's other than 70 days is

18   going to have a situation where cap room is either pushed

19   forward prematurely, if they are shorter than 70, or held back

20   and trapped if they are longer than 70.  And that's the problem

21   with getting away from the proportional allocation that

22   Congress knew was required.  I think if you look at those

23   examples we gave to you, and particularly the second example, I

24   think, is informative, because the government in its opposition

25   to you here posited a two patient scenario, one patient

1    admitted September 1, one October 1.  Now under that scenario

2    under the regulation one patient's cap all falls in the first

3    year, one patient's cap all falls in the second year.  But if

4    you look at the numbers, if you do what the regulation says and

5    you have that patient, both patients stay for 130 days, under

6    the regulation my client owes money back in year two, but under

7    the proportional allocation my client owes no money, because

8    under the proportional allocation more money is pushed forward

9    into the second year, as Congress required, and less money is

10   set aside for the first year where less, a lower percentage of

11   the care is provided.  And I think that if you look at those

12   two examples and you look at what Medicare did when it adopted

13   those regulations it knew this would be prejudicial.  It had no

14   doubt in its mind it had to do something because it knew -- it

15   knew that if it just assigned everybody in the first year it

16   would be prejudicial.  They had to back it up.

17        THE COURT:  And yet, I mean Ms. Scoggins has already

18   told me whatever prejudice there was apparently de minimis, it

19   didn't raise the attention that it does now, now that for

20   whatever reason we are expanding hospice from cancer care

21   treatment, to dementia, to other matters; correct?  I mean now

22   the prejudice that you claim has become worse.

23        MR. DAUCHER:  There's no doubt that with the expansion

24   of the benefit -- and let's talk about how that's been done.

25   Medicare ordered it's intermediaries to promulgate objective

```
 1    eligibility criteria for each of 10 distinct terminal

 2    diagnoses.  These objective eligibility criteria, which my

 3    client follows, are safe harbors for admission of patients.

 4    They are subject to the complete control of Medicare, not to my

 5    client.  And yet if you look at my client's length of stay it's

 6    130 days, it's not 180 days, it's not 210 days, it's not

 7    unlimited, it's 130 days.  And when Medicare did that this

 8    wasn't a bunch of lobbying by the hospice group that

 9    accomplished this.  This was Medicare deciding that it wanted

10    to push the hospice benefit.  Medicare published a letter by

11    Nancy DeParle, the Administrator of Medicare in September of

12    2000, the same letter was sent out by the next administrator.

13    It said there is also a disturbing misconception that a

14    hospices and beneficiaries will be penalized if a patient lives

15    longer than six months.  And what we hear in this courtroom

16    today is that misperception, I think, that the growing length

17    of stay which Medicare itself sought by promulgating objective

18    eligibility criteria is now to be blamed on the private

19    business.  And all --

20              THE COURT:  As you know, I mean it's a complex

21    interplay.  I mean there's a lot of interplay between the

22    industry and HHS, et cetera, et cetera.  But in any event, what

23    your argument is, that the expansion did in fact exacerbate for

24    whatever reasons; right?

25              MR. DAUCHER:  It's true that -- and there's no doubt
```

1   and we've conceded in our briefs that the cap is a problem

2   separate and apart from this regulation, but what we're here

3   telling you is that this regulation makes it worse.  It causes

4   an additional substantial incremental injury that a court

5   should recognize and stop.

6           THE COURT:  And it flies in the face of the statute

7   merely to ease the administrative burden.

8           MR. DAUCHER:  Which the Supreme Court has said is not

9   a good reason.

10          THE COURT:  I understand.  Now Ms. Scoggins says that

11  it is the responsibility of the government to make those

12  calculations.  Well surely the providers in the situation -- of

13  course, you've never been presented with this situation, have

14  you, where you have to apportion?  I mean surely your

15  accountants do an initial apportionment, or under your plan

16  would do an initial apportionment between fiscal years;

17  correct?

18          MR. DAUCHER:  We try to predict where we're going to

19  be.  And one thing is that the providers do not have complete

20  information.  Here's why.  You recall that the statute says

21  apportion both in the case where you stay within one hospice

22  and where you change.  And Medicare said, fine, we will do it

23  where you change but not in one hospice.  Well, the fact is

24  now, and frankly I think it's a result of the cap, that a lot

25  more patients are changing hospice in this country.  And when a

1   patient comes to Sojourn Care with a doctor and says admit me

2   as a patient, we don't necessarily find out whether they have

3   been at another hospice before or for how long.  So when we get

4   our cap demand letters, which by the way was put in the mail

5   for '06 this week to us.  When we get our cap demand letters

6   it's something of a surprise to us exactly what our liability

7   is going to be.  It's always higher than we anticipate because

8   we don't have the omniscient knowledge to see where that

9   patient has been in the past.

10          THE COURT:  I see, because in many cases you may only

11  be apportioned a part of the cap.

12          MR. DAUCHER:  We may be expecting a full share.

13          THE COURT:  Yes.

14          MR. DAUCHER:  And then we don't get it and then that

15  results in a cap repayment demand which is higher.  So it's

16  certainly true that we have some ability to forecast that and

17  actually now we're getting better at anticipating what may be

18  hidden.  But frankly that portion that's hidden is really

19  increasing.

20          THE COURT:  Do you happen to see beds changing around

21  November 1st or October 31st.

22          MR. DAUCHER:  Well, all I can tell you is that we

23  don't discharge our patients for that reason, but I do know

24  other hospices try.

25          THE COURT:  So you do see that in the industry?

1      MR. DAUCHER: We do.  We do.  And we see hospices

2  shutting their doors in Tulsa and elsewhere around the country.

3  We see bankruptcies now this year.  And not all of this is the

4  fault of the regulations.  We're not here saying this is the

5  silver bullet.  What we are saying is that this is an

6  incremental injury that is substantial and that Medicare ought

7  to have fixed.  We went to Medicare in June of 2006 to their

8  offices in Baltimore.  We told them the cap is becoming a

9  bigger problem.  We told them the regulation was inconsistent

10  with the statute.  They looked at us and said it's been on the

11  book 25 years.  You know, we're not going to change it.  Go to

12  court.  Go to Congress.

13      THE COURT: Well, I mean that's frankly a reasonable

14  position for them to take.  They are not going to do it

15  unilaterally.

16      MR. DAUCHER: Well, I would submit that there are

17  agencies that when they see that the regulations aren't

18  functioning as intended anymore, that they do go out

19  voluntarily and suspend and fix those regulations.  In fact, we

20  provided HHS with examples, 10 examples of that across the

21  country where agencies proactively went forward and said you

22  know what, this may not have been a problem before but now it's

23  surfacing.  So often in the law we draft so many statutes that

24  only when the scrutiny of the pipeline of money focused on it

25  do you begin to see the incremental harm that it's caused.  And

1    in the first 20 years of this statute when only cancer patients

2    were treated, and then only at the very end of their lives, no

3    cap was ever hit.  But now 10, 15 percent of the hospices

4    nation wide hit the cap, you know to the tune of a couple

5    percent of the entire hospice budget for Medicare.  So it's

6    becoming a bigger problem and we're here saying that part of

7    that problem, a discrete tangible substantive part of it is

8    that Medicare promulgated a regulation which is inconsistent

9    with what Congress told them to do and it's not immaterially

10   inconsistent or hypothetically inconsistent or conjecturally

11   inconsistent, it's substantivally inconsistent in a way that

12   prejudices our client by trapping those dollars in prior years.

13   And I would submit that the one-nine would move to '04, and

14   some of '04's money would move to '05, and that over time we

15   would realize the benefit of a large percentage of that $2.1

16   million that is trapped behind the doors.

17           THE COURT:  Ever worked in government?

18           MR. DAUCHER:  No, Your Honor.

19           THE COURT:  Well, having been at the Oklahoma Tax

20   Commission, I've seen many situations where an administrator

21   for ease of public administration tries to effectuate the

22   intent of the statute and perhaps doesn't follow it to the

23   letter.  Anything else?

24           MR. DAUCHER:  One thing I want to make, be clear about

25   is we're not here saying there was evil intent with the

35

1    Medicare office.

2            THE COURT:  No, I understand that.

3            MR. DAUCHER:  We're here saying we've got a substantive

4    injury, we are directly affected by this regulation, it won't

5    solve our entire problem but it's material to us.  And the

6    regulation is flatly contradictory to the statute and should be

7    invalidated and have them promulgate a regulation that's fair

8    to us at least in that respect and let us sort out the other

9    cap issues we have, but give us a fair regulation that does

10   what Congress told them to do, a proportional allocation.

11           THE COURT:  Let me ask you, as a matter of law really

12   the only thing before me properly is the validity of this

13   regulation; correct?

14           MR. DAUCHER:  Yes, I don't think it would be proper

15   for you to try to rewrite the law and if you look at what other

16   courts have done when they find a regulation that's inconsistent

17   with the statute they say, back to the drawing board, agency,

18   you do it.

19           THE COURT:  Well, for instance your client seeks an

20   order from me requiring Medicare to return to Sojourn all sums

21   paid by Sojourn based upon the alleged 2005 overpayment.  That

22   really goes beyond, even if you were to win that's an

23   accounting matter, that's not really before me; is it?

24           MR. DAUCHER:  I don't think it is before you on the

25   summary judgment motion.  We're not asking for that order on

1   this motion.  What I would suggest, if I had it my way in this

2   world, is that you would issue an order finding that the

3   regulation is inconsistent with the statute, ordering HHS to

4   re-promulgate a new regulation consistent with the mandate to

5   proportion care across years and then set a status conference

6   on the rest of the case for sometime out, see what happens.

7        THE COURT:  Well, help me, because I'm not familiar

8   with the PRRB.  What were the issues other than the legal issue

9   that it properly determined it did not have jurisdiction over,

10  what were the issues before PRRB?

11       MR. DAUCHER:  Just that.  If you look at Exhibit 1 to

12  RJN you will see you our letter by which we filed an appeal of

13  the determination.  We did not assert that the calculation was

14  materially in error in terms of applying the regulation

15  according to its terms.  We only said to the PRRB that number

16  one, the regulation is inconsistent with the statute,

17  therefore, invalid.  By the way, PRRB, we know that's your job.

18  We're required by law to go to the PRRB first.  They actually

19  have, you know, a federal regulation that anticipates that,

20  allows you to apply for expedited review.  That's what we did.

21       THE COURT:  But does PRRB normally deal with

22  accounting matters.

23       MR. DAUCHER:  So for instance, if we contended that a

24  patient had been improperly included or excluded from a

25  particular year's calculation or if we contended that the

1    physical intermediary or Medicare had wrongly allocated parts

2    of the cap to a different hospice, that's an issue we could

3    take up with the PRRB, did Medicare correctly apply the

4    regulation on the books?  I mean we didn't raise any challenge

5    of that kind to the cap determination.  Instead our challenge,

6    as you know, is just a legal challenge that the regulation is

7    inconsistent with the statute and PRRB, as we expected, came

8    back and said, yeah, go to court.

9         THE COURT:  Well, it just seemed to me frankly as a

10   practical matter that even if you -- even if the Court were to

11   agree with you on the legal issue relative to the validity of

12   the regulation, the PRRB wrestles with these sorts of issues

13   and really is not this Court's expertise, it's theirs, in terms

14   of allocation and specific accounting disputes; correct?

15        MR. DAUCHER:  In terms of sorting out the ultimate

16   question of is Sojourn Care owed money back, is that what you

17   are driving at?

18        THE COURT:  Well, of course you haven't paid off that

19   entire 2.1 million.  Of course to the extent that if the effect

20   of the ruling that you seek were to eliminate altogether that

21   2.1 obligation, the overpayment, that's one thing.  But I think

22   I have heard admission or at least a suggestion that you

23   probably owe something.

24        MR. DAUCHER:  It's possible that not all of that 2.1

25   million will redound to our benefit.  I would certainly concede

```
1    that as an officer to this Court.  It's also possible that

2    separate and apart from the problem with the regulation that

3    Sojourn Care may have cap liability, both of those things are

4    certainly true.  You know, in terms of sorting out those finer

5    number issues, I think that the parties can, with guidance from

6    the Court on the validity of the regulation, work out more

7    pedestrian issues without having to force that to this Court,

8    at least in the short-term.

9              THE COURT:  Anything else?

10             MR. DAUCHER:  No, thank you for entertaining me.

11             THE COURT:  Yes, sir.  And you're from California or

12   from Arizona?

13             MR. DAUCHER:  California, Your Honor.

14             THE COURT:  Yes, sir, Mr. Bensing.  Oh, I'm sorry, Ms.

15   Scoggins, did I abbreviate your presentation?

16             MS. SCOGGINS:  No, I was moving my materials.

17             THE COURT:  No, you're welcome to finish your

18   presentation.  I think now that I think of if you had asked Mr.

19   Daucher to come up in response to one of my questions so --

20             MS. SCOGGINS:  And he addressed the standing issue

21   that you had raised before because he addressed the injury and

22   the redress and all the -- so I believe it's all covered now.

23             THE COURT:  All right.  Mr. Bensing.

24             MR. BENSING:  Thank you, Your Honor, Daniel Bensing on

25   behalf of the defendant here.
```

1    Your Honor, listening to the Court's length colloquy

2    here with plaintiff, I think most of the issues that I would

3    want to bring to the Court's attention have come out, but let

4    me just kind of hit some high points and see what Your Honor's

5    concerns are.

6    On standing, clearly the statute here has a very hard

7    cap to hospice providers.  It has remained unchanged since

8    1983.  We've all talked here about as hospice care has expanded

9    to other types of patients, Congress could logically have

10   stepped in and increased the cap and they haven't done so.  So

11   really the --

12   THE COURT:  Well, but the cap has increased because

13   it's inflation adjusted; correct?

14   MR. BENSING:  Yes.  Yes, certainly it has in that

15   sense from 6500 to over 20,000 currently.  But they haven't

16   done anything else to address the fact there appears to be

17   longer lengths of stay at least in certain areas.  Plaintiffs

18   have effectively conceded repeatedly that yes, the statutory

19   cap is causing their harm.  They have not, I think, carried

20   their evidentiary burden of showing how, if the regulation were

21   rewritten in the way they would like to see it rewritten, it

22   would affect them in 2005.  And I would think -- and these

23   accounting issues get tricky as we've all seen here today, but

24   I would think that the concern about patients in other hospices

25   really shouldn't affect this because those are allocated

1     proportionally patient by patient.

2            THE COURT:  Absolutely.  And I think they refer to it

3     in large part to say, see they already do it with respect to

4     patients who hop between hospices.

5            MR. BENSING:  And of course there's a reason for that

6     which is we have to for fairness.

7            THE COURT:  Sure.

8            MR. BENSING:  So the only unanswered question then is,

9     okay, if we did it the way plaintiff wants and allocate on a

10    patient-by-patient for the length of stay in Sojourn in each

11    year, what affect would that have on the cap.  And that's a

12    calculation I would think that they could do, they should have

13    done, and they could then have shown if indeed it is the case

14    that the rule is causing them some harm.  So they really

15    ultimately haven't carried their burden of establishing that

16    something other than the statute is causing them the harm here

17    and therefore, at the end of the day I think the Court properly

18    shouldn't reach the merits, should simply say they lack

19    standing and move on.

20           The examples that we talked about, all of them are --

21    you know any example is going to have counter examples, but you

22    need again to look at this for each patient over all years and

23    see how it's going to affect them over a number of years.  And

24    merely looking at one example and say well, see, this one going

25    to adversely affect me, really doesn't tell us anything.

```
1              It is, I think, very instructive, and I will tell the
2    Court this.  Reference was made to the letter for the
3    plaintiff's 2006 cap year.  That, in fact, went out yesterday,
4    February 12.  I e-mailed a copy to plaintiff's counsel last
5    night.  It seeks reimbursement for approximately $4.2 million.
6    So we see over the 2002 to 2006 time period plaintiffs are
7    bumping up against the cap and now substantially exceeding it.
8    And again, the only conclusion I think you can draw is that
9    their length of stay is the cause of it and the congressional
10   mandate for a cap is what is causing them the harm.  They
11   haven't shown that the rule is, in any sense is the problem.
12              THE COURT:  Well, it certainly seems that that
13   probably is the majority of their travail at this point in
14   time, but do they not have standing if part of their problem
15   relates to the regulations.  And I understand, I would have
16   been much happier if I had had something concrete to tell me
17   this is what we calculate the harm we've suffered to have been.
18   But if I am to -- and I'm going to ask them more about that --
19   but let's say I accept their argument, is it not enough for
20   standing that part of their problem and not all of it relates
21   to the regulation?
22              MR. BENSING:  I certainly concede that, yes.  The
23   other point in terms of looking back --
24              THE COURT:  I mean, it does seem to me that to a
25   certain extent they are seeking any port in a storm here, and
```

1   this is an available port particularly if the port will enjoin

2   your attempts to seek reimbursement.

3           MR. BENSING:  Yes, sir.

4           THE COURT:  I mean that would be a great port.  Go

5   ahead.

6           MR. BENSING:  But, yes, if they can show that then

7   they would have standing to challenge the rule to the extent

8   that the rule is causing them some harm.  That's the

9   evidentiary showing they simply have not made.

10          The other thing is the plaintiffs have -- maybe it's

11  just language shorthand but they refer to capping trapped in

12  the past and they want to move it forward.  The regulation and

13  the statute doesn't contemplate a carryforward right.

14          THE COURT:  Like income averaging.

15          MR. BENSING:  Like income average.  In the plaintiff's

16  theory we would have to do a proportional allocation on a

17  patient-by-patient basis and that might -- might move some of

18  the cap forward into another year.  But they can't just say,

19  oh, I've got a million nine in unused cap in '03 --

20          THE COURT:  I'm going to apply it to 05.

21          MR. BENSING:  Yeah.

22          THE COURT:  See, that's -- you heard my question to

23  Ms. Scoggins.  I can't imagine that it would have much effect

24  on '05.  Agreed --

25          MR. BENSING:  Agreed.  So that's, I think, what I want

1    to say about standing.

2          On the merits, Your Honor, again it's a question of

3    statutory construction.  We have a statute that we contend has

4    some ambiguity in it.  It uses the word "proportion," but it

5    uses the phrase "reflect the proportion."  And we submit and we

6    cited a couple of kind of off the wall cases in our brief in

7    instances where the courts have said well, okay an agency has a

8    statute that has a mathematical term exact or proportion or

9    something like that.  That doesn't mean the agency is engaged

10   in taking a math test where they come up with only one right

11   answer.  The statutory language like that has some ambiguity

12   such that agencies can step in and say, okay, how can we

13   effectuate the intent of Congress in such a manner that carries

14   out all of the responsibilities of the agency, including, and I

15   think Your Honor is quite right on this, administrative

16   convenience has to be at least one factor to be looked at.  And

17   so we submit that HHS's regulation was a reasonable way to

18   effect --

19          THE COURT:  Reflect the proportion.

20          MR. BENSING:  Reflect the proportion.  And

21   understanding that it's not going to be perfect, but over a

22   number of years it should all even out.  And that's where

23   plaintiff hasn't carried their burden of showing something to

24   the contrary, and it's just sensible way to administer this

25   because, you know, it's self-evident that the alternative would

44

1    be that every time a patient in hospice care dies, or moves to

2    another hospice, or goes home because he's getting better, one

3    would have to go back and recalculate the cap based upon that

4    change and then another change three days later and another

5    change a week later. And just -- it's possibly workable but

6    certainly very very inefficient and very hard for providers to

7    predict what their cap is going to be.

8            So just on general Chevron deference principles, and

9    we cited the Gray Panthers case where the court said, you know,

10    the Social Security Act and the Medicare that built on top of

11    it is an exceptionally complicated statutory scheme where

12    judicial deferences is properly at its height.

13            Ms. Scoggins' colleague had a number of statements

14    that were really not in the record about the history of this

15    program, the expansion of hospice care, the 2000 letter,

16    meetings with HHS about this. Obviously I just note that

17    that's not in the record. I don't think it's really relevant

18    to the issues before the Court in any case.

19            THE COURT: So let me see if I understand the

20    technical application here. The proportion here is the

21    proportion of that Medicare beneficiary used as a multiplier.

22    In other words, if after the Medicare beneficiary passes away

23    between two fiscal years, and let's say our calculation is that

24    the Medicare beneficiary was provided services in fiscal year

25    '04 at 20 percent of the time, fiscal year '05 at 80 percent of

1   the time.  Under the current calculation, let's say that the

2   entire cap was allocated to '04.  In this case the person would

3   be counted .2 in fiscal year '04, is that how the calculation

4   works?

5           MR. BENSING:  No, the calculation takes a beneficiary

6   and allocates him entirely in either one year or the other.

7           THE COURT:  No, I understand that.  I understand that,

8   but under their proposal.

9           MR. BENSING:  Oh, under their proposal.

10          THE COURT:  It would reflect the proportion of that

11  unitary Medicare beneficiary.  In other words, he would be

12  counted at .2 of an individual in fiscal year '04.  Is that

13  basically how it works?

14          MR. BENSING:  That is my understanding of what they

15  want.  That is, they want a patient-by-patient allocation and

16  so we would have to look at each patient, see his total time in

17  hospice care and then divide it evenly based on the November

18  first cutoff date.

19          THE COURT:  All right, let's look.  And I fully

20  understand administrative convenience because in the real world

21  having spent two years in a state administrative agency, I mean

22  that's how the world works, it really is.  But I still have to

23  wrestle with this, this statute to see if it was construed

24  invalidly.  When it says "reduced to reflect the proportion of

25  hospice care that each such individual was provided in a

1    previous or subsequent accounting year or under a plan of care

2    established by another program." I mean there is the "or"

3    that's placed in there seems to suggest, as the plaintiff

4    suggests, that you need to treat those individuals who were

5    provided hospice care in two or more accounting years the same

6    way you treat Medicare beneficiaries treated under plans of

7    care established by two programs.

8            MR. BENSING: I think that what I would have to say is

9    that the phrase "reflects the proportion" is one that gives the

10   agency some discretion to find a number of different ways that

11   that proportion can be allocated. They chose in the second

12   clause "in-care in another hospice program" to be precise, to

13   do it patient by patient to make sure that there's fairness to

14   the different providers and because, at least at the time it

15   was assumed, I think not unreasonably, that people were going

16   to go into one hospice and serve their time there and not shift

17   from one to the other. And in the first clause dealing with

18   care within one hospice over more than one year, the agency

19   says, well, in this case we think it fairly reflects the

20   proportion by just saying on the basis of a rule like we have

21   where do we think a majority of the care is going to occur. If

22   it's the first year on two year carryover we'll put it all in

23   one year, if it's the second we'll put it all in the second

24   year.

25           THE COURT: But under your construction -- and like

1    Mr. Daucher, this wasn't done in bad faith, it was done for
2    administrative convenience -- you aren't reducing the number at
3    all, are you?  I mean, Congress said you have to reduce the
4    number.  Now you focus on the words "reflect the proportion,"
5    but you aren't even reflecting that proportion imperfectly
6    because you are not reducing the number.  You are allocating it
7    to one of two fiscal years.  So you have ignored the words
8    "such number reduced" because with you if that hospice is
9    providing care in two fiscal years you're either allocating it
10   to the first fiscal year or the second, you're not reducing the
11   number as Congress told you to do.
12          MR. BENSING:  I think the agency chose to looks at
13   this in the aggregate and said if we're looking at a cohort of
14   patients of several hundred, and they are going to serve in
15   various lengths of time over two years, that this regulation
16   fairly reflects that proportion and adjusts, reduces or
17   increases in the aggregate across two years.  That's the way
18   they interpreted the statute, and we submit it's -- it's, you
19   know, it's not as precise as perhaps plaintiff's reading would
20   be but it's, I submit, a reasonable and permissible one under
21   Chevron.
22          THE COURT:  I'm just curious.  In the civil division
23   do you focus your practice for this agency or do you take
24   whatever comes in?
25          MR. BENSING:  I'm in the federal programs branch and

```
 1    basically our warrant is all cases of national significance
 2    seeking injunctive relief against the government.  We have a
 3    lot of Medicare cases as you might imagine, but I am not -- I
 4    am not a Medicare expert by any means.
 5            THE COURT:  Anything else?
 6            MR. BENSING:  Not that I can think of.  Thank you,
 7    Your Honor.
 8            THE COURT:  Thank you very much.  Anybody need to take
 9    a short break.
10            MR. DAUCHER:  We would appreciate a short break.
11            THE COURT:  Yes, let's take a short recess.  We'll be
12    in recess about 10 minutes.
13            MR. DAUCHER:  Thank you.
14            (Recess).
15            THE COURT:  Be seated please.  Ms. Scoggins.
16            MS. SCOGGINS:  Thank you, Your Honor.  Just a few
17    things to respond to Mr. Bensing.  First and foremost, I
18    believe that the government's questioning now what proportion
19    means and the application of proportion is disingenuous at
20    best, is disingenuous at best, because obviously they apply the
21    proportion to the people, the individuals, the beneficiaries
22    who change hospices and it's the same proportion as would be
23    applied when care goes over different accounting years, plus
24    all the references that I have made to the record and even to
25    their own brief says that the government decided that instead
```

1    of doing it proportionately this is the way they were going to

2    do it.  So they have admitted that they are not doing it

3    proportionately as the statute and Congress mandated.

4         Now with regard to standing.  The government admits

5    that there probably is some injury caused by this method of

6    calculation, and I don't want to have to take you through a

7    specific calculation, but if you would look at our example,

8    which I think it's on page 16 or 17 of our materials, if you

9    would look at that where it talks about their very example.

10   They say, they give you an example on page 9 of their brief

11   about someone who is admitted to a hospice, a hospice has two

12   patients with one.

13        THE COURT:  All right, but these are examples.  I mean

14   this is the real problem --

15        MS. SCOGGINS:  Yes, these are just examples.

16        THE COURT:  This is the real problem that I have with

17   your materials on summary adjudication.  I mean, ideally I

18   would have some CPA who has tried to put a pencil to it who has

19   told me what the dollar impact of the alleged invalid

20   regulation is on you.

21        MS. SCOGGINS:  Well --

22        THE COURT:  Because as I sit here right now I can

23   conceive that part of the quarter million dollar amount in

24   fiscal year '04 might serve to offset the $2.1 million

25   obligation that you had for fiscal year '05, but even if you

1   prevailed here on the merits it's no magic bullet for your

2   client.

3       MS. SCOGGINS:  Well, that's correct, Your Honor.  But

4   I believe that we have shown and the government has admitted

5   that it likely damages us and it does not have to be -- does

6   not have to relieve every injury.  And I direct your attention

7   specifically to the Larsen case which we've cited in our brief,

8   that says a plaintiff satisfies the redressability requirement

9   when he shows that a favorable decision will relieve an injury

10  to himself.  He need not show that a favorable decision will

11  relieve his every injury.  And that's the Larsen case.  And

12  also for example in the Bakke case that most of us are familiar

13  with, when Bakke sued the California regents that law

14  admissions case, the U.S. Supreme Court court said that Bakke

15  need not have proved that he would have been admitted to the

16  medical program -- it was a medical program, that's right -- to

17  demonstrate his injury.  And that's a Supreme Court case, the

18  Bakke case from 1978.  And a footnote in the Larsen case is

19  even more on point because it talks about that the dissent in

20  that case had said basically that the person seeking redress

21  had requirements to prove exactly what kind of redress and how

22  the regulation should be rewritten.  And in that very footnote

23  which is footnote 15 on page 243 of the opinion, it says the

24  relevant inquiry is whether the plaintiff has shown an injury

25  to himself that is likely to be redressed by a favorable

51

```
 1    decision.  It says it's a draconian interpretation of the

 2    redressability requirement.

 3              THE COURT:  And that's Bakke?

 4              MS. SCOGGINS:  No, this is the Larsen case.

 5              THE COURT:  All right, thank you.

 6              MS. SCOGGINS:  It says to say that in order to

 7    establish redressability that appellees must show that they are

 8    certain ultimately to receive a -- and in this case they were

 9    seeking a religious organization exemption from the

10    registration and reporting requirements, that's a draconian

11    interpretation of the redressability requirement.  And it's our

12    position that it would be draconian in this case when we've

13    shown the likelihood of injury in addition to showing that we

14    are the party, as in the Lujan case, says if you are the party

15    at whom a statute is directed or a regulation is directed, then

16    the likelihood of injury is presumed.

17              THE COURT:  What's interesting here is, I mean it

18    doesn't appear that the application of the regulation was

19    draconian in 1983 but because of the expansion of the program

20    it has become draconian.

21              MS. SCOGGINS:  Well, and that's not what they were

22    saying in this case about what something -- was draconian or

23    not.  They were saying to require a plaintiff to prove the

24    injury, their redress, that their injury is going to be

25    redressed, that that requirement is draconian in the Larsen
```

```
1    case in that footnote.  And so I believe we have established

2    standing and that we should not be required to rewrite the

3    regulation for the Medicare program.

4             And in conclusion, Your Honor, unless you have other

5    questions we would just ask -- state that this regulation

6    refuses to abide the statutory requirement to allocate cap room

7    proportionately across years and that you should hold the

8    regulation invalid.

9             We also ask and have asked that the Court issue a stay

10   or grant a stay enjoining them from calculating the cap under

11   what we believe is -- or enforcing or collecting further sums

12   under what the Court would find to be an invalid regulation.

13            THE COURT:  Well, now, that's not part of this motion

14   for summary judgment, is it?

15            MS. SCOGGINS:  Okay.  No.  No, it is not.  In the

16   motion for summary judgment, Your Honor, we're asking that the

17   Court declare this regulation invalid.

18            THE COURT:  Right.  You're morphing over into your

19   motion for stay or actually your application for injunction.

20            MS. SCOGGINS:  That's correct.

21            THE COURT:  All right.

22            MS. SCOGGINS:  And again I direct your attention to, I

23   think, the three cases on standing that are very informative

24   and control in this situation are the Lujan case, which we've

25   cited all Supreme Court cases, Lujan and the Larsen cases and
```

**Exhibit A**
65

1    the Bakke case.  And as a matter of fact even there's one other

2    case from '76 that's referred to in many of these decisions and

3    it's Simon vs. Eastern Kentucky Welfare Rights Organization

4    case.  Based on the findings in those cases and the law as

5    stated in those cases I believe that Sojourn Care has certainly

6    established a sufficient likelihood of injury and not for

7    every -- I don't believe as I believe just as the footnote

8    says, it would be draconian to require, and they do not see

9    that as being required of a plaintiff in a case such as this to

10    establish each and every, what it would be liable for or what

11    the results might be based on a new regulation.

12            THE COURT:  Now you had stated earlier on the record

13    that you believed that had this law been applied as you

14    interpret it that your client would not have any of the $2.1

15    million obligation.

16            MS. SCOGGINS:  No, we've never said that, not in our

17    briefs or anything.

18            THE COURT:  All right.

19            MS. SCOGGINS:  Never.  And in fact, you know, to me

20    you can take all the explanations and the arguments and

21    everything and say if you are subject to a cap and you are

22    going to give money out over a period of time that's subject to

23    that cap, that the cap ought to follow that money, that the

24    revenue stream and the cap ought to coincide.  And that is

25    all -- that's what the statute says but that is not what the

54

1    regulation does, and for that reason we believe that the

2    regulation is invalid.

3         THE COURT:  How do you-all wish to address this, Mr.

4    Bensing, because you have cross motion.  Was your argument

5    relative to both?  I wasn't entirely clear.

6         MR. BENSING:  No, our briefs are identical, Your

7    Honor, and I think that we have said everything we need to say

8    on both motions.

9         THE COURT:  All right.  With due respect, and frankly

10   the trigger has to be pulled here one way or the other, not

11   intending to create great problems here, but with due respect I

12   agree with the plaintiffs here that the regulation as written

13   does not comport or comply with the statute, and I don't

14   believe the delay bars a finding of invalidity here.  As

15   reflected on this record, the change in the program apparently

16   has changed the economic model such that the application of

17   this regulation now is such that it has drawn this attack.  I

18   don't believe that the statutory language which requires that

19   the number of Medicare beneficiaries is to be reduced is in any

20   way reflected in an allocation to one of the fiscal years, one

21   or the other, and it's certainly not -- it doesn't honor the

22   statutory language that the number must be reduced to reflect

23   the proportion of hospice care that each such individual was

24   provided.  The government understandably in its advocacy

25   focuses upon the words "to reflect the proportion."  But the

Exhibit A
67

1    question, even when we're focusing on that clause is one which
2    I don't believe passes scrutiny here.  The number of Medicare
3    beneficiaries is simply not reduced under this regulation in
4    any way to reflect the proportion of hospice care that each
5    such individual was provided in a previous or subsequent
6    accounting year, and focusing on this last phrase, "that each
7    such individual was provided in a previous or subsequent
8    accounting year," rather the regulation for administrative
9    convenience, and I make no moral determination here.  Obviously
10   it was adopted for administrative convenience which I have
11   recognized on this record is a common practice.  I simply don't
12   believe that it follows the statutory mandate in the statute.
13           Now I don't believe, frankly, that summary judgment
14   should extend beyond a finding of invalidity.  So if I'm
15   reading the motions correctly, the motion for summary judgment
16   of the plaintiff is granted, the motion for summary judgment of
17   the defendant is denied.  And also with respect to standing
18   which gave me great pause here, I do believe, although I don't
19   believe at all that the ultimate accounting here is going to
20   save the plaintiff's bacon, it's going to have a very small
21   impact, I believe.  You know, I reserve judgment on that.  In
22   fact, I don't believe I should be the one to render judgment on
23   that.  Frankly, I'll take your suggestions here, but it seems
24   to me this matter ought to be sent back to PRRB for that
25   determination.  I can always retain some jurisdiction for any

1    matters that they can't address, but that's not before me

2    today.  I'll let you think about how you want to do that.

3            Now, in terms of the application for stay pending

4    adjudication of dispositive motions.  Well, the dispositive

5    motions have been adjudicated so in that sense it's moot.

6    That's docket number 29.  Docket number 32, the unopposed

7    motion for hearing on plaintiff's application for stay is moot

8    because I just ruled on it.  So I think we've handled

9    everything on my plate today.  I can let you think about how we

10   wish to proceed.  As I say, you know, in the event the

11   plaintiff wishes to seek an injunction from this Court -- and

12   let's just call it what it is, it's an injunction, it's not a

13   motion to stay -- the plaintiff is going to have to come up

14   with a lot better evidence.  I mean because the plaintiff here,

15   as I understand the request to stay pending adjudication of

16   dispositive motions, was to stop any and all collections.

17   Well, it appears on this record presented on the motion for

18   summary adjudication that it may affect pennies on the dollar,

19   but the bulk of that overpayment obligation is going to remain.

20   So you-all need to get your army of accountants on this thing

21   before you come back to me.  Anything else?

22           MR. BENSING:  Is there going to be a written order,

23   Your Honor?

24           THE COURT:  Well, let me give you the reality here.

25   When I came on just a year ago I was handed about 325 motion

```
 1    many of very, very old, years old, and so that's in part why we

 2    have hearings like this because I can do it much more

 3    efficiently on the record.  Unfortunately it doesn't -- it's

 4    not perfect but for administrative convenience in order to

 5    provide some justice for some other folks this is how it's

 6    going to be done.  So the record will reflect the ruling of the

 7    Court.  We will simply issue a very short order, written order

 8    granting the motion for summary judgment for the plaintiff,

 9    denying that of the defendant.  The docket sheet will reflect

10    the adjudication of the other two motions.  Anything else?

11            MS. SCOGGINS:  I believe that's all, Your Honor.

12            THE COURT:  I would like to get to the point where I

13    could render these scholarly decisions but, you know, tomorrow

14    we've got a motion, real old, and then we've got a Paxil case

15    on Friday and then next Tuesday we've got a two-week hearing on

16    whether or not chicken waste, the application of chicken litter

17    should be enjoined in a million acre parcel straddling Oklahoma

18    and Arkansas, so we've got our hands full.

19            All right, thank you-all very much.  We are adjourned.

20

21            A TRUE AND CORRECT TRANSCRIPT.

22

23            CERTIFIED:    s/ Glen R. Dorrough
                            Glen R. Dorrough
24                          United States Court Reporter

25
```