SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
BRIAN M. DAUCHER, Cal. Bar No. 174212
BRIAN B. FARRELL, Cal. Bar No. 247878
Telephone: 714-513-5100
Facsimile: 714-513-5130
bdaucher@sheppardmullin.com
bfarrell@sheppardmullin.com

Attorneys for Plaintiff,
Los Angeles Haven Hospice, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES HAVEN HOSPICE, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN SEBELIUS, Secretary of United States Department of Health and Human Services,<br><br>Defendant. | CASE NO. CV08-4469-GW (RZx)<br><br>*The Honorable George H. Wu*<br><br>**[PROPOSED] ORDER GRANTING HAVEN HOSPICE'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Information:<br>Date: July 13, 2009<br>Time: 8:00 a.m.<br>Crtrm.: 10<br><br>[Notice of Motion and Motion, Separate Statement of Undisputed Facts, Request for Judicial Notice, and Declarations of Lynn Keitz and Brian B. Farrell Filed Concurrently Herewith]<br><br>Complaint Filed: July 8, 2008<br><br>Trial Date: Not set |

On Monday, July 13, 2009, at 8:00 a.m. in courtroom 10 of the above entitled Court, the motion for summary judgment by plaintiff Los Angeles Haven Hospice, Inc. ("Haven Hospice") came on for hearing, the Honorable George H. Wu, Judge, presiding. The Court, having reviewed all papers filed in connection with the motion, rules as follows:

The Court finds that the following facts are undisputed as to Haven Hospice's request for declaratory judgment regarding the validity of 42 C.F.R. § 418.309(b):

1. In 1998, Congress <u>removed</u> the first limit. Now, a patient may remain in hospice care for an <u>unlimited</u> number of days provided they remain certified as terminally ill with a life expectancy of six months or less. (42 U.S.C. § 1395d(d)(1).)

2. However, Congress has not yet changed the second limit, namely that the total payments to a hospice provider in any fiscal year may not exceed an aggregate cap, calculated as the product of the individual cap amount (adjusted annually for inflation) and the "number of Medicare beneficiaries" in a hospice program in a given accounting year. (42 U.S.C. § 1395f.)

3. The Medicare Act specifically provides that the "number of beneficiaries" in an accounting year for cap purposes <u>must</u> be adjusted to reflect the time <u>each such individual</u> was provided hospice care in a previous or subsequent accounting year: "For the purposes of subparagraph (A), the 'number of Medicare beneficiaries' in a hospice program in an accounting year is equal to the number of individuals who have made an election under subsection (d) of this section with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, such number reduced to reflect the proportion of

hospice care that each such individual was provided in a previous or subsequent accounting year or under a plan of care established by another hospice program." (42 U.S.C. § 1395f(i)(2)(C).)

4. In 1983, when HHS issued its proposed regulation to implement the hospice cap, it acknowledged that Congress had instructed it to perform a proportional allocation: "The statute specifies that the number of Medicare patients used in the calculation is to be adjusted to reflect the portion of care provided in a previous or subsequent reporting year or in another hospice." (48 F.R. 38,146 at 38,158 (Aug. 22, 1983).)

5. However, HHS nonetheless declined to adopt a regulation consistent with Congress' express mandate and instead chose to give providers credit for the cap only in the initial year of service, regardless whether the patient lived into another accounting year: "With respect to the adjustment necessary to account for situations in which a beneficiary's election overlaps two accounting periods, we are proposing to count each beneficiary only in the reporting year in which the preponderance of the hospice care would be expected to be furnished rather than attempt to perform a proportional adjustment." (48 F.R. 38,146 at 38,158 (Aug. 22, 1983).)

6. In so doing, HHS conceded that it was planning not to implement the plain language of the statute because it would be "difficult": "Although section 1814(i)(2)(C) of the Act specifies that the cap amount is to be adjusted 'to reflect the proportion of the hospice care that each such individual was provided in a previous or subsequent accounting year . . .' such an adjustment would be difficult in that the proportion of the hospice stay occurring in any given year would not be known until the patient dies or exhausted his or her hospice benefits. We believe the

        proposed alternative of counting the beneficiary in the reporting period where the beneficiary used most of the days of covered hospice care will achieve the intent of the statute without being burdensome." (48 F.R. 38,146 at 38,158 (Aug. 22, 1983).)

7. Notably, however, when it came to implementing the companion statutory requirement that the cap be apportioned among different hospices if two or more hospices provided services to a specific patient, HHS did require such proportional calculations: "When a beneficiary elects to receive hospice benefits from two different hospices, we are proposing a proportional application of the cap amount."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"We are aware that this type of apportioning of the beneficiary's stay may result in the inclusion of a beneficiary in the calculation of the cap for a reporting period other than the period for which the services were furnished, since it is necessary that the beneficiary die or exhaust his or her benefits before the percentage can be determined. However, we believe that this proposal is the most equitable means of implementing the statutory directive to adjust the cap amount to reflect the proportion of care furnished under a plan of care established by another hospice program." (48 F.R. 38,146 at 38,158 (Aug. 22, 1983).)

8. In December 1983, HHS issued its final hospice reimbursement regulations, including the provision allocating the hospice cap amount for a beneficiary only in the initial year in which the patient elected hospice care. The regulation provides: "Each hospice's cap amount is calculated by the intermediary by multiplying the adjusted cap amount determined in paragraph (a) of this section by the number of Medicare beneficiaries who elected to receive hospice care from that hospice

during the cap period. For purposes of this calculation, the number of Medicare beneficiaries includes –

(1) Those Medicare beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care, in accordance with § 418.24 from the hospice during the period beginning on September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period).

(2) In the case in which a beneficiary has elected to receive care from more than one hospice, each hospice includes in its number of Medicare beneficiaries only that fraction which represent the portion of a patient's total stay in all hospices that was spent in that hospice. . . " (42 C.F.R. § 418.309(b)(1) and (2).)

9. HHS' reporting year for hospices runs from November 1 to October 31 of each year. (42 C.F.R. § 418.309(b).)

10. HHS advanced the "initial year" cap calendar 35 days earlier, based on its assumption that the average length of stay in hospice care would be 70 days. Under HHS' revised cap year, if a patient's care started on or after September 28, that patient's full cap allowance would be pushed into the second year of care, not the first year of care. (42 C.F.R. § 418.309(b)(1).)

11. HHS' advancement of the initial year cap calendar by 35 days (with a 70 day length of stay) in December of 1983 was a revision of its earlier attempt in August of 1983 to estimate the average length of stay at 44 days. The August 1983 regulation states: "[F]or purposes of calculating the payment cap, we are proposing that the hospice count beneficiaries who have filed an initial election to receive hospice care

after October 9, which is less than 22 days before the end of the cap period, in the subsequent year. This figure represents half of the mean length of stay in the demonstration project. This method will produce a reasonable estimate of the proportionate number of beneficiaries to be counted in each cap period." (48 F.R. 38,146 at 38,158 (Aug. 22, 1983); 42 C.F.R. § 418.309(b)(1).)

12. In calendar year 2005, hospices across 15 states had average lengths of stay in hospices in excess of 70 days. (Declaration of David Daucher, filed in <u>Sojourn Care, Inc. dba Sojourn Care of Tulsa v. Michael O. Leavitt</u>, Case No. 07-CV-375-GKF-PJC (N.D.Ok. filed 2007), attached to Request for Judicial Notice as Exhibit 1.)

13. Haven Hospice's average length of stay for FY 2006 was in excess of 200 days, and Haven Hospice's historical average length of stay (since opening in June 2003) also exceeds 200 days. (Keitz Decl., ¶ 2-5.)

14. Haven Hospice received its license as a hospice provider in Los Angeles, California in June 2003. Since that time, Haven Hospice has served approximately 1500 patients in the Los Angeles area. (Keitz Decl., ¶ 6.)

15. In fiscal year 2006 (ended October 31, 2006), Haven Hospice served many patients first admitted in fiscal year 2005. HHS paid Haven Hospice for these services as rendered in fiscal year 2006. (Keitz Decl., ¶ 7.)

16. On April 2, 2008, HHS sent Haven Hospice a demand for repayment of $2,352,499 for exceeding its fiscal year 2006 cap. While this suit is pending, Haven Hospice is repaying this amount with 12.5% interest. (Keitz Decl., ¶ 8.)

17. In or around February 2008, Haven Hospice learned that another federal district court had determined that the regulation pursuant to which HHS performs the cap calculation was invalid as contrary to Congress' express directives. Specifically, the <u>Sojourn Care</u> court found that 42 C.F.R. § 418.309(b)(1) "doesn't honor the statutory language that the number must be reduced to reflect the proportion of hospice care that each such individual was provided," before granting summary judgment that the regulation was invalid. the court in <u>Sojourn Care</u> made the following findings on the record about the HHS regulation governing calculation of the cap (42 C.F.R. § 418.309(b)), before granting summary judgment that the regulation was invalid: "[W]ith due respect I agree with the plaintiffs here that the regulation as written does not comport or comply with the statute … I don't believe that the statutory language which requires that the number of Medicare beneficiaries is to be reduced is in any way reflected in an allocation to one of the fiscal years, one or the other, and it's certainly not – it doesn't honor the statutory language that the number must be reduced to reflect the proportion of hospice care that each such individual was provided … The number of Medicare beneficiaries is simply not reduced under this regulation in any way to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent reporting year … I simply don't believe that it follows the statutory mandate in the statute." (Keitz Decl., ¶ 9; Request for Judicial Notice, Exhibit 2 (Reporter's Transcript from hearing on motion for summary judgment).)

18. On May 14, 2008, Haven Hospice timely filed an appeal of the cap determination with the Provider Reimbursement Review Board

        ("PRRB"), challenging the fiscal year 2006 calculation of its cap, calling out the prior district court's determination of the regulation's invalidity, and challenging the validity of 42 C.F.R. § 418.309(b)(1). With this appeal, because it appeared that the PRRB may have lacked jurisdiction to assess the validity of a regulation, Haven Hospice also sought expedited judicial review. (Administrative Record, attached to Request for Judicial Notice as Exhibit 3, pp. 5-6.)

19. On June 5, 2008, the PRRB granted Haven Hospice's expedited judicial review request, finding that there are no material facts in dispute, that the amount in controversy exceeds $10,000, and that Haven Hospice's appeal involves principally a legal challenge to the validity of the regulation. HHS could have challenged Haven Hospice's standing at the PRRB stage, prior to the PRRB's determination that "the estimated amount in controversy for the appeal exceeds $10,000," but it declined to do so. (Administrative Record, attached to Request for Judicial Notice as Exhibit 1, pp. 1-2.)

     Based upon these facts, the Court concludes that 42 C.F.R. § 418.309(b)(1) is invalid as contrary to Congress' express directive in Section 1814 (i)(2)(C) of the Medicare Act (codified at 42 U.S.C. §1395f (i)(2)(C)).

     As a result, Haven Hospice's motion for summary judgment is granted.

     42 C.F.R. § 418.309(b)(1) is thus vacated as invalid and its prospective use is hereby enjoined, HHS' prior calculations of Haven Hospice's cap liability under 42 C.F.R. § 418.309(b)(1) are set aside, and this matter is remanded to HHS for further proceedings not inconsistent with these findings.

Dated: _____    _____

                                                      THE HONORABLE GEORGE H. WU

                                                        Central District of California

1  Respectfully submitted:
2  Dated: May 26 2009

3              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
4              By
5                    _____
                     BRIAN M. DAUCHER
6                    BRIAN B. FARRELL
7              Attorneys for Plaintiff
8              Los Angeles Haven Hospice, Inc.

-8-